UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X          Index no.  07 CV 9557
 TIME'S UP, INC.


          Plaintiffs,                                                    COMPLAINT


                    -Against-


THE CITY OF NEW YORK,
COMMISSIONER OF THE NEW
YORK CITY POLICE DEPARTMENT                               JURY TRIAL
RAY KELLY, OFFICER CAROLYN                                DEMANDED
FANALE, OFFICER STEVEN BOBBETT,
OFFICER LUIS MORTIMER (16934),
 DEPUTY INSPECTOR THOMAS GRAHAM
and  APPROXIMATELY 34 OTHER UNIDENTIFIED
NEW YORK CITY POLICE OFFICERS,
                              Defendants.
------------------------------------------------------X

**PLAINTIFF TIME'S UP, INC., by their counsel, WYLIE STECKLOW, ESQ.**

allege as follows for their Complaint against the above defendants:

1.      This is an action to redress the deprivation by the defendants of rights

secured to the Plaintiff TIME'S UP, INC., ("TIME'S UP!"),  by the Constitution of the

United States and the State of New York.

2.      TIME'S UP! was subjected to unlawful invasion, entry, and search of its

premises in the absence of probable cause or a warrant, unlawful assault upon,

harassment of, unlawful imprisonment and arrest of its members and associates, and

deprivation of its rights to expressive speech, peaceably assemble, associate with its

neighbors and engage in its lawful activities.

3.      This is an action for damages sustained by citizens of the United States

against police officers of the New York City Police Department, who unlawfully

imprisoned, assaulted, and harassed individuals and unlawfully invaded, entered and

searched the premises of, and interfered with the right of peaceable assembly of, and freedom of speech for, TIME'S UP! and its members.

4.      The action is against the Police Commissioner RAYMOND KELLY as the supervisory officer responsible for the conduct of the defendants and for the Commissioner's failure to take corrective action with respect to police personnel whose propensities to violate the constitutional rights of others were notorious, to assure proper training and supervision of the personnel, or to implement meaningful procedures to discourage lawless official conduct, and for the Commissioner's issuance of instructions, directives and policies that resulted and were intended to result in the unlawful abridgment and violation of the PLAINTIFF'S constitutional rights, and against the CITY OF NEW YORK as the employer of the police personnel, which is sued as a person under 42 U.S.C. § 1983.

5.      This action is against the following officers in their individual capacities for their individual and collective violations of the constitutional rights of the PLAINTIFFS, as set forth in detail below:  OFFICER CAROLYN FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER  (16934), DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER UNIDENTIFIED NEW YORK CITY POLICE OFFICERS,

## JURISDICTION AND VENUE

6.      The jurisdiction is founded upon the existence of a Federal Question.

7.      This is an action to redress the deprivation under color of statute, ordinance, regulation, custom, or usage of a right, privilege, and immunity secured to the plaintiff by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the

United States, pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988, and arising under the law and statutes of the City and State of New York.

8.    Jurisdiction is founded upon 28 U.S.C. 1331, 1343(3) and 1343(4), this action being authorized by law to redress the deprivation under color of law, statute, ordinance, regulation, custom, or usage of a right, privilege, and immunity secured to the plaintiff by the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

9.    Venue is properly laid in the Southern District of New York under U.S.C. § 1391(b), in that this is the District in which the claim arose.

## JURY DEMAND

10.    Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

11.    The plaintiff, TIME'S UP!, is a domestic non-profit organization, formed and incorporated under the laws of New York State with a principal office and headquarters in New York County.

12.    The plaintiff, TIME'S UP! engages in educational events and expressive activities for the purpose of promoting environmental awareness, including bicycling as a clean transportation alternative, and in support of the rights of citizens to enjoy, use, and benefit from clean transportation alternatives.

13.    TIME'S UP! also engages in activities to provide legal support for citizens exercising their right to travel by bicycle, to make use of public streets and thoroughfares,

and to seek redress for unlawful or unreasonable restrictions on these rights by governmental authorities.

14.    That the defendant Officer CAROLYN FANALE is a New York City Police Lieutenant, and at the time of occurrence underlying this complaint, was stationed at the 5th precinct.

15.    That the defendant Officer STEVEN BOBBETT is a New York City Police Officer, at the time of occurrence underlying this complaint, was stationed at the 5th precinct.

16.    That the defendant Officer LUIS MORTIMER is a New York City Police Officer, at the time of occurrence underlying this complaint, was stationed at the 5th precinct, badge number 16934.

17.    That the defendant DEPUTY INSPECTOR THOMAS GRAHAM is a New York City Police Officer was the senior ranking officer at the time and place of occurrence underlying this complaint.

## FACTS COMMON TO ALL CLAIMS

18.    At all times relevant to this action, defendants "John Doe" were police officers employed by the New York Police Department ("NYPD"). These defendants' names are currently unknown to and undiscoverable by plaintiff. The plaintiff will amend this complaint to state the true name of these "John Does" as soon as possible.

19.    Upon information and belief these unidentified defendants were also responsible for the assaults, false imprisonments, physical and emotional injuries of individuals, and the unlawful invasion, entry, and search of TIME'S UP! premises in the absence of probable cause or a warrant, unlawful assault upon, harassment of, arrest of TIME'S UP! members and associates, and deprivation of TIME'S UP! rights to

expressive speech, peaceably assemble, rightfully associate with its neighbors and engage in its lawful activities.

20.     At all times relevant to this action, defendant RAYMOND KELLY was the duly appointed Commissioner of the New York City Police Department. In this capacity, the Commissioner was the commanding officer of defendants OFFICER CAROLYN FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER (16934), DEPUTY INSPECTOR THOMAS GRAHAM and all "John Doe" defendants, and was responsible for their training, supervision, and conduct.

21.     At all times relevant to this action, defendant RAYMOND KELLY was responsible by law for enforcing the regulations of the New York City Police Department and for ensuring that New York City police personnel obey the laws of the State of New York and of the United States.

22.     Upon information and belief, at all times relevant, defendants were operating and acting in their official capacity as agents of New York City.

23.     Upon information and belief, that at all times hereafter mentioned, the defendant, CITY OF NEW YORK, was and still is a municipal corporation duly organized and existing under the, and by virtue of the, laws of the State of New York.

24.     Upon information and belief, that at all times hereafter mentioned, the NEW YORK CITY POLICE DEPARTMENT (NYPD) is an agency operated and controlled by the Defendant, THE CITY OF NEW YORK.

25.     Upon information and belief, that at all times hereafter mentioned, defendants NEW YORK CITY, its agents, servants and employees, including the NYPD, operated, maintained, controlled and trained the COMMISSIONER OF THE NEW YORK CITY POLICE DEPARTMENT RAY KELLY and OFFICER CAROLYN

FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER  (16934),

DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER

UNIDENTIFIED NEW YORK CITY POLICE OFFICERS.

26.    Upon information and belief, each defendant is, and at all times relevant

was, the agent, employee or representative of each other defendant. Each defendant, in

doing the acts, or omitting to act as alleged in this Complaint was acting within the scope

of his or her actual or apparent authority, or the alleged acts and omissions of each

defendant, as agent, subsequently were ratified and adopted by each other defendant as

principal.

27.    During all times relevant in this Complaint, the defendants were acting

under color of law, that is, under color of the constitution, statutes, laws, charter,

ordinances, rules, regulation, customs and usage's of New York City and the State of

New York.

## ***CRITICAL MASS PRE-RNC***

28.    On the last Friday of every month in New York City there are a

community of individuals that join together for a bicycle ride in Manhattan ("Critical

Mass Bike Ride"  or "CM").

29.    The first CM ride in Manhattan was in 1993.

30.    Prior to August 2004, the NYPD lent support to this community activity.

31.    Prior to August 2004, the NYPD support included having a few officers

accompany the bicyclists on the ride and facilitate the movement of this group of riders

by stopping automotive traffic at intersections whereby the NYPD would allow the entire

group of bicyclists to stay together as one group rather than have some get lost behind

other vehicles or at red lights.

32.     In August 2004, a decision had been made by the NYPD to no longer facilitate this ride.

## *THE REPUBLICAN NATIONAL CONVENTION*

33.     On information and belief, this change in NYPD policy was made due to the pending Republican National Convention ("RNC").

34.     On information and belief, pursuant to the NYPD spying program in place prior to the RNC, intelligence was gathered on TIMES UP! including that they were having a planning conference prior to the RNC.

35.     On information and belief, pursuant to the NYPD spying program in place prior to the RNC, intelligence was gathered on Critical Mass, which included information about the August 2004 ride.

36.     On information and belief, pursuant to the NYPD spying program in place prior to the RNC, intelligence was gathered that associated TIMES UP! with Critical Mass.

37.      On information and belief, the NYPD made a decision to make mass arrests at the Critical Mass Bike Ride that took place on Friday August 27, 2004.

38.     The RNC began on Monday August 30, 2004 in New York City.

39.     On August 27, 2004, the NYPD made more than 200 arrests of  bicycle riders.

40. Upon information and belief, one reason the NYPD decided to make mass arrests on August 27, 2004 was an attempt to chill the expressive conduct of the CM participants who were deemed to be potential RNC protestors.

41.    Upon information and belief, another reason the NYPD decided to make mass arrests on August 27, 2004 was as a 'dry run' to effectuate a large number of arrests so that the NYPD would be more prepared for the arrests they were planning on making during the RNC.

42.    On August 27, 2004, the NYPD made more than 200 arrests of peaceful bicycle riders.

43.    The following week during the RNC, the NYPD made more than one thousand arrests.

44.    Numerous lawsuits have resulted from the action of the NYPD on August 27, 2004 and the NYPD action during the RNC (See Kyne et al v. Wolfowitz et al, 06 CV 2041, Schiller v. City of New York, 04 Civ. 7922, MacNamara v. City of New York, 04 Civ. 9612).

45.    "Until the summer of 2004, the Manhattan [CM] rides took place with little police presence, and no arrests."  NYPD v. TIMES UP! et al, slip op. @ 3 (Decision 2-14-06).

46.    In the months following the August 27, 2004 ride, the NYPD continued to have a change of attitude towards the Critical Mass Bike Ride.

47.    In September 2004, 8 arrests were made at the Critical Mass Bike Ride.

48.    In October 2004, 33 arrests were made at the Critical Mass Bike Ride.

49.    In November 2004, 17 arrests were made at the Critical Mass Bike Ride.

50.    In December 2004, 1 arrest was made at the Critical Mass Bike Ride.

51.    In January 2005, 8 arrests were made at the Critical Mass Bike Ride.

52.    In February 2005, 14 arrests were made at the Critical Mass Bike Ride.

53.    In March 2005, 37 arrests were made at the Critical Mass Bike Ride.

54.     In April 2005, 35 arrests were made at the Critical Mass Bike Ride.

55.     In May 2005, 10 arrests were made at the Critical Mass Bike Ride.

56.     In June 2005, 11 arrests were made at the Critical Mass Bike Ride.

57.     In July 2005, 33 arrests were made at the Critical Mass Bike Ride.

58.     In August 2005, 48 arrests were made at the Critical Mass Bike Ride.

59.     In September 2005, 36 arrests were made at the Critical Mass Bike Ride.

60.     In October 2005, 0 arrests were made at the Critical Mass Bike Ride.

61.     In November 2005, 3 arrests were made at the Critical Mass Bike Ride.

62.     In December 2005, 12 arrests were made at the Critical Mass Bike Ride.

63.     In January 2006, 14 arrests were made at the Critical Mass Bike Ride.

64.     In February 2006, 4 arrests were made at the Critical Mass Bike Ride.

65.     In March 2006, 4 arrests were made at the Critical Mass Bike Ride.

66.     In April 2006, 1 arrest was made at the Critical Mass Bike Ride.

67.     In May 2006, 1 arrest was made at the Critical Mass Bike Ride.

68.     In June 2006, 1 arrest was made at the Critical Mass Bike Ride.

69.     In July 2006, 1 arrest was made at the Critical Mass Bike Ride.

70.     In August 2006, 1 arrest was made at the Critical Mass Bike Ride.

## *BRAY V. THE CITY OF NEW YORK 04 CV 8255*

71.     During the September 2004 Critical Mass Bike Ride, the NYPD used a chain saw to cut bicycle locks.

72.     During the September 2004 Critical Mass Bike Ride, the NYPD cut bike locks and removed bicycles that were locked to street lamps, parking meters or other fixed objects without charging the bicycle's owners with any crime.

9

73.    Subsequent to the September 2004 conduct, five individuals filed a Federal Lawsuit against the NYPD and the City of New York seeking among other relief, an injunction estopping the NYPD from cutting bike locks and removing bicycles that were parked on the sidewalks and streets of New York City.  (Bray et al v. the City of New York, et al, 04 CV 8255 (WHP), 346 F.Supp.2d 480 (SDNY 2004).

74.    In responding to this lawsuit, on or about October 25, 2004, the attorneys for the City of New York defendants requested an injunction requiring that the Critical Mass Bike Ride apply for a City Permit and to follow a specific route.

75.    Immediately prior to the October 2004 Critical Mass Bike Ride, the Honorable Judge Pauley issued a written decision that denied the City's request for an injunction.

76.    In that same decision, Judge Pauley granted declaratory relief in favor of the Plaintiffs ruling that the NYPD could not cut bicycle locks and seize bicycles without charging the owners of these bicycles with a criminal charge.  Bray v. City of New York, 356 F.Supp.2d 277 (SDNY 2004).


## *OCTOBER (HALLOWEEN) 2004 RIDE*

77.    Immediately prior to the October 2004 Critical Mass Bike Ride, DEFENDANT COMMISSIONER RAYMOND KELLY published an 'op-ed' piece in the *New York Daily News* titled, ***"EXTREMISTS HAVE HIJACKED THE BIKE RIDES."***

78.    Within this writing, DEFENDANT COMMISSIONER RAYMOND KELLY states as fact that dangerous people are involved in the critical mass bike ride

and that the NYPD and the citizens of New York are in danger as long as these 'extremists' are allowed to continue in this ride.

79.    Upon information and belief, DEFENDANT COMMISSIONER RAYMOND KELLY had identified TIMES UP! as the 'extremists' who had taken over the ride to the officers of the NYPD.  Many NYPD documents identify TIME'S UP! as the organizers and chief sponsors of the Critical Mass ride.

80.    The October 2004 Critical Mass Bike Ride took place on October 29, 2004.

81.    The NYPD deployed more than fifty officers to monitor the October Critical Mass Bike Ride.

82.    The NYPD deployed at least one helicopter to monitor the October Critical Mass Bike Ride.

83.    Upon information and belief, NYPD activities relating to the October 2004 Critical Mass Bike Ride were directed, coordinated, and controlled at the highest levels of the NYPD, including DEFENDANT COMMISSIONER RAYMOND KELLY.

84.    The participants in the ride and most of the NYPD officers assigned to this matter all met at Union Square at approximately 6:30 pm on October 29, 2004.

85.    The NYPD passed out information falsely claiming that there was a specific route for the October Critical Mass Bike Ride.

86.    Plaintiff TIME'S UP! was hosting a Halloween Party Fundraiser that evening and passed out invitations to many of the participants at the Critical Mass Bike Ride.

87.     TIME'S UP! Halloween Party was to occur at the organization's headquarters at 49 East Houston Street in Manhattan, New York City ("TIME'S UP! space or premises").

88.     The purpose of the TIME'S UP! Halloween Party was to assemble members and associates of TIME'S UP!, to raise funds for the organization's activities and to increase its membership.

89.     This event was to be the sole fundraiser, and the major source of funds for the group to finance their educational events and expressive activities, including the promoting of environmental awareness and advocating bicycling as a clean transportation alternative, and in support of the rights of citizens to enjoy, use, and benefit from clean transportation alternatives.

90.     Entry to the TIME'S UP! headquarters and the Halloween Party was by permission only.  Each person seeking to enter was required to make a small donation to enter the premises.

91.      TIME'S UP! sought to restrict entry to only those persons who were TIME'S UP! members and associates, or who were interested in supporting TIME'S UP! activities and goals.

92.     At all times relevant herein, a member or associate of TIME'S UP! remained at the door to 49 East Houston St. to enforce this entry policy.  As part of this entry policy, those who sought entry who were unwilling to contribute to the event's fundraising effort were denied entry.

93.     After the ride had ended, many participants of the Critical Mass Bike Ride, and TIME'S UP! members and associates attended the TIME'S UP! Halloween Party located at 49 East Houston Street between Mulberry and Mott Street.

# *NYPD ILLEGALY ENTERS TIMES UP! SPACE*

94.    At some point in the evening, the officers of the NYPD, including defendants, arrived at the TIME'S UP! space.

95.    Initially, officers of the NYPD, including defendants, attempted to enter the TIME'S UP! space.  The officers refused to pay the entry fee, and were denied permission to enter.  At this time they did not identify themselves as police officers.

96.    Notwithstanding this refusal, and notwithstanding the fact that they had no warrant to enter the TIME'S UP! space, and there was no probable cause to enter the space, at least one officer in plain clothes forced his way into the space, and began hitting, pushing, and striking those inside.

97.    Upon information and belief, this officer was defendant MORTIMER.

98.    Upon information and belief, the officer that entered the TIME'S UP! premises was called back by DEFENDANT FANALE.

99.    Those remaining in the TIME'S UP! space closed and secured the doors, in order to prevent further incursions and attacks.

100.    ~~REDACTED~~

101.    ~~REDACTED~~

102.    Upon information and belief,  Defendant FANALE  at all times relevant herein, was a member of NYPD Special Operations.

103.    More than a dozen police vehicles arrived on the scene.

104.    Among the official vehicles that were at the scene included, but are not limited to:

    a.    **NYPD Cruiser 2652**

     **b.**        **NYPD Cruiser 1249**

     **c.**        **NYPD Cruiser 1534**

     **d.**        **NYPD Cruiser 1304**

     **e.**        **NYPD Cruiser 1830**

     **f.**        **NYPD Cruiser 5th Pct Patrol Supervisor 2435**

     **g.**        **MSTF Minivan 5685**

     **h.**        **SUV Plate BAF 4571**

     **i.**        **SUV Plate CSY 7219**

     **j.**        **FDNY Van Battalion Chief 901**

105.    These vehicles blocked vehicular traffic on Houston Street from Mulberry to Mott Street in all lanes traveling East and in one lane traveling West.

106.    Officers of the NYPD, including defendants, closed down Houston Street heading East from Lafayette to Mott Street.

107.    Among those responding (~~REDACTED~~) were members of the Disorder Control Unit, and the Emergency Service Unit.

108.    At some point, Captain John Duffy arrived at the scene.

109.    At some point, DEFENDANT INSPECTOR THOMAS GRAHAM arrived at the scene.

110.    Upon information and belief, DEFENDANT INSPECTOR THOMAS GRAHAM, all times relevant herein, was a member of the NYPD Disorder Control Unit.

111.    At some point, one or more members of the legal affairs department of the NYPD arrived at the scene, including NYPD attorney Martin Gleason.

112.    Officers of the NYPD, including defendants, were unable to gain authority or permission to enter the TIME'S UP! space from TIME'S UP! members or associates.

113. ~~REDACTED~~

114. They were told not to enter the premises.

115. Officers of the NYPD, including defendants, were unable to gain authority or permission to enter the TIME'S UP! space from the NYPD legal counsel on the scene.

116. Officers of the NYPD, including defendants, formed a wall of officers blocking the front of the TIME'S UP! space.

117. Officers of the NYPD, including defendants, had been on the scene for over an hour while civilian individuals were walking on Houston Street observing the situation.

## *ARRESTS OF INDIVIDUALS*

118. Amy Starecheski, Laura Starecheski and Mandy Hu (Plaintiffs in a companion case, index # 06-CV-2512 (PAC)), were inside the TIME'S UP! space when officers of the NYPD, including defendants, arrived.

119. Thereafter, Amy Starecheski, Laura Starecheski and Mandy Hu decided to exit the TIME'S UP! space and to leave the area.

120. When Amy Starecheski, Laura Starecheski and Mandy Hu left the TIME'S UP! space, they were instructed by officers of the NYPD, including defendants, to exit to the East.

121. As Amy Starecheski, Laura Starecheski and Mandy Hu began to exit to the east, there was a crowd of people in front of them blocking their path of egress.

122. Officers of the NYPD, including defendants, who were telling them to keep walking were pushing Amy Starecheski, Laura Starecheski and Mandy Hu in the back.

123.    Mandy Hu turned around to explain that they couldn't move due to the crowd blocking their path.

124.    As Mandy Hu turned around and explained that they could not move, an UNIDENTIFIED DEFENDANT OFFICER again pushed her, but this time in the chest.

125.    Mandy Hu reacted by yelling at the UNIDENTIFIED DEFENDANT OFFICER, in sum and substance, "DO NOT TOUCH MY BREASTS."

126.    The UNIDENTIFIED DEFENDANT OFFICER immediately grabbed Mandy Hu and began placing her under arrest.

127.    Amy Starecheski and Laura Starecheski were standing next to Mandy Hu when she was arrested.

128.    Amy Starecheski and Laura Starecheski were also immediately placed under arrest.

129.    Tahira ALFORD was not at the TIME'S UP! space when officers of the NYPD, including defendants, arrived on the scene.

130.    After attending an Aids in Africa event, Tahira ALFORD and a friend had stopped at a bodega on the corner of Houston Street and Mott Street on their way to a café.

131.    Tahira ALFORD is a journalist who had with her on this evening Journalist Identification and a video camera.

132.    Tahira ALFORD was wearing her Journalist Identification on the outside of her jacket, in a clearly visible position.

133.    Tahira ALFORD began videotaping outside the TIME'S UP! space.

134.    For more than ten minutes, Tahira ALFORD videotaped the scene on Houston Street between Mott and Mulberry Street.

135.    Among the images captured on this video and/or others, was an NYPD officer shaking up a can of pepper spray.

136.    Among the images captured on this video and/or others, was an NYPD officer carrying a sniper Rifle on Houston Street.

137.    Thereafter, officers of the NYPD, including defendants, abruptly began to clear Houston Street between Mott and Mulberry Street.

138.    Tahira ALFORD was videotaping outside the TIME'S UP! space when she heard the NYPD instruct people to clear the block.

139.    As Tahira ALFORD began to move off the block, she was pushed by an NYPD officer off of the sidewalk, into the street.

140.    Moments later, Tahira ALFORD was instructed to stay on the sidewalk.

141.    As Tahira ALFORD was requesting information on whether she should exit the block from the street or from the sidewalk, Defendant FANALE approached her.

142.    Defendant FANALE instructed ALFORD to exit the block.

143.    Defendant FANALE put her hand in front of ALFORD's camera.

144.    Defendant FANALE pushed ALFORD in an aggressive manner.

145.    Defendant FANALE then raised her arm and made ALFORD fear that Defendant FANALE was going to strike her.

146.     Defendant FANALE then grabbed the back of ALFORD's neck.

147.    Defendant FANALE lifted TAHIRA ALFORD off the ground.

148.    On the date in question, TAHIRA ALFORD  weighed approximately one hundred and ten pounds and stood 5'3" tall.

149.    On the date in question, Defendant FANALE, on information and belief, was a few inches taller and many pounds heavier and stronger than TAHIRA ALFORD.

150.    TAHIRA ALFORD was quickly moved by a number of NYPD Officers, including Defendant FANALE, and upon information and belief, other defendants, from the location where she was grabbed by Defendant FANALE to the hood of a parked NYPD vehicle approximately ten feet away.

151.    TAHIRA ALFORD was smashed face down into the top of the hood of this vehicle.

152.    TAHIRA ALFORD had been holding her video camera this entire time.

153.    Officers of the NYPD, including defendants, then began harming TAHIRA ALFORD's arm and hand and  camera.

154.    Officers of the NYPD, including defendants, did not stop harming TAHIRA ALFORD's hand and arm until she dropped her camera.

155.    Upon information and belief, officers of the NYPD, including defendants, then attempted to destroy the camera in order to destroy its contents.

156.    Immediately thereafter, TAHIRA ALFORD requested that her camera be returned to her.

157.    Immediately thereafter, TAHIRA ALFORD requested that her camera be vouchered.

158.    Upon information and belief, officers of the NYPD, including defendants, failed to voucher this camera.

159.    Upon information and belief, officers of the NYPD, including defendants, held this camera for at least one hour until the TIME'S UP! space had been closed.

160.    TAHIRA ALFORD was handcuffed, taken into custody, and transported to the Fifth Precinct by UNIDENTIFIED DEFENDANTS.

## TIME'S UP! PLAINTIFF

161.    After the individuals were each placed into a NYPD vehicle for transport to the local precinct for processing officers of the NYPD, including defendants, continued to completely block the exit from the TIME'S UP! space.

162.    All individuals inside the TIME'S UP! were either members or guests of TIME'S UP!

163.    The arrests of Tahira Alford, Amy Starecheski, Laura Starecheski, Mandy Hu and others in front of the TIME'S UP! premises was clearly visible by those inside the TIME'S UP! Space.

164.    All individuals inside the TIME'S UP! space were in fear of arrest if they exited the TIME'S UP! space.

165.    All individuals inside the TIME'S UP! space were forced to wait until Civil Liberties Attorney Norman Siegel arrived on the scene at approximately 1:00 am.

166.    Upon information and belief, Counselor Siegel spoke with DEFENDANT Inspector Graham at the scene and was told that some individuals were arrested already and one individual had assaulted a female Police Lieutenant.

167.    Counselor Siegel was able to negotiate the exit from the TIME'S UP! space for those remaining inside the space at that time.

168.    Counselor Siegel spoke with the individuals inside the TIME'S UP! space and thereafter, led them out of the space.

169.    The individuals were instructed by officers of the NYPD, including defendants, to exit west on  Houston Street.

## *NYPD VIOLATE JUDGE PAULEY'S COURT ORDER*

170.    Although the NYPD had been at this location for more than two hours, only as the remaining individuals were being escorted from Times UP! by Counselor Siegel and instructed they must walk West on Houston Street, did officers of the NYPD, including defendants,  retrieve a chain saw from one of the NYPD vehicles and began to use the chainsaw to cut off bicycle locks from bicycles attached to the fence surrounding the Puck Building.

171.    Cutting these bike locks was in direct contravention of the order of the Honorable Judge Pauley.

172.    Upon information and belief, officers of the NYPD, including defendants, had previously contacted the owner or manager of the Puck Building and sought permission to cut these bicycles from their fence.

173.    Upon information and belief, officers of the NYPD, including defendants, falsely informed the Puck Building owner or manager that the bicycles presented a danger to the building.

174.    Upon information and belief, as NYPD began cutting down the bicycles attached to the fence surrounding the Puck Building, the subject bicycles were locked to this fence in a way that was no different than the way bicycles were locked to the fence on other nights.

175.    In response to why officers of the NYPD, including defendants, were cutting these locks, they told others, including those whose bikes were being taken by the NYPD, that this was being done at the request of the owner or manager of the Puck Building.

176.    The NYPD Technical Assistance Response Unit ("TARU") was also present video taping parts of these events.

177.    The act of videotaping by the NYPD is controlled by the <u>Handschu</u> agreement.

178.    Video taping the events of this evening violated the <u>Handschu</u> agreement.

## *NYPD BRINGS SUIT IN STATE COURT,*
## *AGAINST TIME'S UP!, TO STOP CRITICAL MASS*

179.    On or about March 15, 2005, the City of New York, Ray Kelly, the NYPD (collectively "NYPD plaintiffs") and others brought a state court complaint against TIMES UP! and individuals deemed to be associated with TIMES UP! wherein the NYPD plaintiffs sought declaratory judgments and injunctions stopping the Critical Mass Bike Rides. <u>City of NY v. Time's UP, et al,</u> 2005 CV 400891 (NY Supreme Ct.).

180.    Within this lawsuit, the NYPD plaintiffs asserted that TIMES UP! is associated with the monthly Critical Mass ride and that it 'advertises, promotes and encourages' participation in Critical Mass. (Paragraph 5 of the NYPD Plaintiffs State complaint).

181.    On February 15, 2006, the Honorable Judge Michael Stallman denied the NYPD plaintiffs' requested relief.

182.    Within this decision, the Court recited and adopted the Federal Court decision that participation in Critical Mass is an expressive activity protected by the First Amendment, "a Federal Court has held that participation in the Critical Mass rides constitutes 'expressive association' entitled to First Amendment protection." <u>City of NY v. Time's UP, et al</u>, 2005 CV 400891 (NY Supreme Ct.) 2-1-06 decision, Slip op. @ 22, *citing,* <u>Bray,</u> 346 F.supp.2d at 488.

183.    Upon information and belief, THE CITY OF NEW YORK, COMMISSIONER OF THE NEW YORK CITY POLICE DEPARTMENT RAY

KELLY and the NYPD knew, had cause to know, and displayed willful indifference to the fact that prior to October 29-30, 2004, DEFENDANT INSPECTOR THOMAS GRAHAM had previously violated the constitutional rights of citizens of the City of New York.

184.    Upon information and belief, THE CITY OF NEW YORK, COMMISSIONER OF THE NEW YORK CITY POLICE DEPARTMENT RAY KELLY and the NYPD knew, had cause to know, and displayed willful indifference to the fact that prior to October 29-30, 2004, Defendant FANALE had previously violated the constitutional rights of citizens of the City of New York.

185.    On August 8, 2004, an article appeared in the New York Times in which the author witnessed Defendant FANALE violate the constitutional rights of citizens in Chinatown and Little Italy and participate in personal activities while on duty.

186.    Upon information and belief, THE CITY OF NEW YORK, COMMISSIONER OF THE NEW YORK CITY POLICE DEPARTMENT RAY KELLY and the NYPD knew, had cause to know, and displayed willful indifference to the fact that prior to October 29-30, 2004, police activity conducted in relation to gatherings of expressive organizations resulted in unconstitutional and illegal searches and seizures of persons and property, illegal and unwarranted arrests, and the use of excessive force.

187.    As an example of prior conduct wherein the NYPD violated a group (and their members') rights in an attempt to chill expressive speech, on or about November 16, 2003, the NYPD falsely assaulted, arrested and imprisoned eight individuals who had gathered to raise funds as a group called Anarchist People of Color.

188.    All of the defendants were found not guilty at trial.

189.    This false arrest, assault and unlawful imprisonment resulted in a lawsuit, Mutis v. NYC, et al, (05CV0848) which alleged, among other claims, first amendment violations.

190.    On or about March 9, 2007, The City of New York agreed to settle the Mutis lawsuit with a total payment of three hundred and fifty-five thousand ($355,000.00) dollars.

FIRST CAUSE OF ACTION
*DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983*

191.    The PLAINTIFF repeats and realleges each and every allegation set forth in those paragraphs of the complaint marked and numbered previously with the same force and effect as if more fully set forth at length herein.

192.    All of the aforementioned acts of defendants, their agents, servants and employees, were carried out under the color of state law.

193.    All of the aforementioned acts deprived the Plaintiff of its' rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

194.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

195.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

196.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

197.    As a proximate result of the unconstitutional conduct of the defendants, the PLAINTIFF was injured, caused to incur attorneys' fees, associated legal expenses and other special damages, and have suffered great mental anguish, all to the Plaintiff's damage in a sum to be provided at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus attorney's fees.

SECOND CAUSE OF ACTION
*FALSE IMPRISONMENT UNDER 42 U.S.C. § 1983*

198.    The  PLAINTIFF repeat and reallege each and every allegation set forth in those paragraphs of the complaint marked and numbered previously with the same force and effect as if more fully set forth at length herein.

199.    As a result of the aforesaid conduct by defendants, Plaintiffs was subjected to illegal, improper and false imprisonment by the defendants and caused to be falsely imprisoned, detained, and confined, without any probable cause, privilege or consent.

200.    As a result of the foregoing, Plaintiff and its members were restricted for an extended period of time, they were put in fear for their safety, and they were humiliated and subjected to  physical restraint without probable cause.

201.    As a proximate result of the unconstitutional conduct of the defendants, the PLAINTIFF and its members were injured, caused to incur attorneys' fees, associated legal expenses and other special damages, and have suffered great mental anguish, all to

the Plaintiff's damage in a sum to be provided at trial but not less than FIVE MILLION

DOLLARS ($5,000,000.00), plus attorney's fees.


### THIRD CAUSE OF ACTION
*EXCESSIVE FORCE UNDER 42 U.S.C. §1983*

202.   The  PLAINTIFF repeats and realleges each and every allegation set forth

in those paragraphs of the complaint marked and numbered previously with the same

force and effect as if more fully set forth at length herein.

203.   The level of force employed by defendants was objectively unreasonable

and in violation of  PLAINTIFF'S constitutional rights.

204.   As a result of the aforementioned conduct of defendants, PLAINTIFF was

subjected to excessive force,  caused to incur attorneys' fees, associated legal expenses

and other special damages, and have suffered great mental anguish, all to the Plaintiff's

damage in a sum to be provided at trial but not less than FIVE MILLION DOLLARS

($5,000,000.00), plus attorney's fees.


### FOURTH CAUSE OF ACTION
*FAILURE TO INTERVENE*

205.   The  PLAINTIFF repeats and realleges each and every allegation set forth

in those paragraphs of the complaint marked and numbered previously with the same

force and effect as if more fully set forth at length herein.

206.   Each and every individual defendant had an affirmative duty to intervene

on PLAINTIFF'S behalf to prevent the violation of their constitutional rights.

207.   The individual defendants failed to intervene on PLAINTIFF'S behalf to

prevent the violation of their constitutional rights despite having had a realistic

opportunity to do so.

208.    As a result of the aforementioned conduct of the individual defendants, PLAINTIFF'S constitutional rights were violated, and they were subjected to harm and damages, caused to incur attorneys' fees, associated legal expenses and other special damages, and have suffered great mental anguish, all to plaintiffs' damage in a sum to be provided at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus attorney's fees.

### FIFTH CAUSE OF ACTION
*MUNICIPAL LIABILITY CLAIM 1*

209.    The PLAINTIFF repeats and realleges each and every allegation set forth in those paragraphs of the complaint marked and numbered previously with the same force and effect as if more fully set forth at length herein.

210.    Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

211.    The aforementioned customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department included, but were not limited to, a) attempting to chill political speech and actions by unlawfully targeting individuals who advocate or appear to advocate positions critical of the government, b) utilizing unnecessary and excessive force in effecting politically-motivated arrests, c) singling out individuals, groups, and organizations for different, unfavorable, illegal, and unconstitutional treatment because of their political views, their speech, and/or their association with other individuals or groups espousing political views

disfavored by the defendants, and d) unlawfully targeting gatherings of individuals identified with viewpoints critical of the government.

212.    Upon information and belief, this policy was directed particularly towards participants in Critical Mass rides, and persons and groups perceived to be associated with Critical Mass, including the PLAINTIFF.

213.    Upon information and belief, this policy was directed particularly towards groups involved in expressive activity, which the defendants did not agree with, including the PLAINTIFF.

214.    Upon information and belief, pursuant to this policy, THE CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, the NYPD, and their officers, agents, and employees, issued instructions to NYPD officers, agents, and employees, including the other defendants, to implement the policy.

215.    Upon information and belief, pursuant to this policy, NYPD officers, agents, and employees, including the other defendants, were instructed to engage in widespread violation of the Constitutional rights of the persons and groups targeted by this policy, including illegal searches and seizure of persons and property, unlawful arrests, excessive use of force and unlawful monitoring, spying, and data collecting.

216.    Upon information and belief, the NYPD and its officers, agents, and employees, including the defendants, implemented this policy by subjecting participants in Critical Mass rides, and persons and groups perceived to be associated with Critical Mass, to illegal searches and seizure of persons and property, unlawful arrests, selective law enforcement of rarely enforced statutes and laws,  excessive use of force, and unlawful monitoring, spying, and data collecting.

217.    Upon information and belief, POLICE COMMISSIONER RAYMOND KELLY, knew of, had reason to know of, instigated, and directed the implementation of this policy.

218.    The foregoing customs, policies, usages, practices, procedures and rules of the City of New York and the New York City Police Department constituted deliberate indifference to the safety, well being and constitutional rights of the PLAINTIFF.

219.    Upon information and belief, pursuant to this policy, on October 29-30 , 2004, THE CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, the NYPD, and their officers, agents, and employees, targeted the persons gathered at the TIME'S UP! space, and all those near the TIME'S UP! space, including passersby, for illegal searches and seizure of persons and property, unlawful arrests,  excessive use of force, and unlawful monitoring, spying, and data collecting.

220.    Upon information and belief, at all times relevant herein, employees, officers and agents of the NYPD with supervisory and policymaking authority were aware of, and directed, the violation of the Constitutional rights of the persons in or near the TIME'S UP! space on October 29-30 , 2004,

221.    Upon information and belief, among those officers, agents and employees of defendants with supervisory and policy-making authority who were present at the scene included DEFENDNAT FANALE, Captain John Duffy, DEFENDANT Inspector Thomas Graham, and one or more members of the legal affairs department of the NYPD.

222.    Upon information and belief, all acts engaged in by the officers, employees and agents of the CITY OF NEW YORK and the NYPD who were present at the scene were supervised, directed, controlled and approved by those officers, agents

and employees of defendants with supervisory and policy-making authority, including those aforenamed and the defendants.

223.    By directing employees, officers and agents of the NYPD to violate the constitutional rights of the PLAINTIFF the defendants caused the injuries to the Plaintiff through the actions and inactions of the officers, employees and agents of the CITY OF NEW YORK and the NYPD who were present at the scene.

224.    As authorized representatives of Defendant, THE CITY OF NEW YORK, and COMMISSIONER RAYMOND KELLY, and the NYPD, the conduct of the officers, agents and employees of defendants, constituted a custom, policy and practice which renders the Defendants, THE CITY OF NEW YORK and COMMISSIONER RAYMOND KELLY, liable to the PLAINTIFF as a "Person" acting under the color of state law.

225.    These customs, policies and practices were enforced by THE CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, the NYPD, and their officers, agents, and employees, who issued instructions to NYPD officers, agents, and employees, including the Defendants OFFICER CAROLYN FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER  (16934), DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER UNIDENTIFIED NEW YORK CITY POLICE OFFICERS, and these customs, policies and practices were the moving force, proximate cause, or affirmative link behind the conduct causing deprivation of the constitutional rights of the PLAINTFF, harm to the PLAINTIFF  and the PLAINTIFF'S injuries.

226.    THE CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, and the NYPD are therefore liable for violations of the Plaintiff's constitutional

rights as caused by Defendants OFFICER CAROLYN FANALE, , OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER (16934), DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER UNIDENTIFIED NEW YORK CITY POLICE OFFICERS, as described in more detail in the foregoing paragraphs; and the PLAINTIFFS have suffered damages therefrom.

227.    All of the foregoing acts by defendants deprived plaintiffs of federally protected rights, including, but not limited to, the right:

A. Not to be deprived of liberty without due process of law;

B. To be free from seizure and arrest not based upon probable cause;

C. Not to have excessive force imposed upon them;

D. To exercise their First Amendment Rights;

E. To be free from unwarranted and malicious criminal prosecution;

F. To be free from malicious abuse of process;

G. Not to have cruel and unusual punishment imposed upon them;

H. Not to be subject to unlawful data monitoring, gathering and spying by the Government; and

I. To receive equal protection under the law.

228.    As a proximate result of the unconstitutional customs, policies and practices of THE CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, and the NYPD the PLAINTIFF was injured, caused to incur attorneys' fees, associated legal expenses and other special damages, and have suffered great mental anguish, all to plaintiffs' damage in a sum to be provided at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus attorney's fees for each plaintiff.

## SIXTH CAUSE OF ACTION
### *MUNICIPAL LIABILITY CLAIM II*

229.    The  PLAINTIFF repeats and realleges each and every allegation set forth in those paragraphs of the complaint marked and numbered previously with the same force and effect as if more fully set forth at length herein.

230.    Upon information and belief, the CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, THE NYPD, and their officers, agents, and employees, including the defendants, knew that by custom, policy and practice, persons and groups perceived to be associated with Critical Mass were subjected to illegal searches and seizure of persons and property, unlawful arrests, and excessive use of force by NYPD officers, agents, and employees.

231.    Upon information and belief, it was the custom, policy and practice of the CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, THE NYPD, and their officers, agents, and employees, including the defendants to tolerate, condone, and encourage constitutional violations.

232.    Upon information and belief, the CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, THE NYPD, and their officers, agents, and employees, including the defendants, failed to train, supervise and control their officers, agents, and employees, and permitted illegal searches and seizure of persons and property, unlawful arrests, and excessive use of force by NYPD officers, agents, and employees to continue.

233.    Upon information and belief, the CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, THE NYPD, and their officers, agents, and employees, including the defendants, knew that their failure to train, supervise, and

control their officers, agents, and employees, did, and was likely to, result in illegal and unconstitutional searches and seizure of persons and property, unlawful arrests, and excessive use of force by NYPD officers, agents, and employees.

234.    Members of the NYPD, such as defendants, OFFICER CAROLYN FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER  (16934), DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER UNIDENTIFIED NEW YORK CITY POLICE OFFICERS, were aware at all times alleged in this complaint that their unconstitutional conduct would not be investigated or questioned, and that they would receive no reprimand or be punished for their conduct.

235.    By failing to supervise, train and reprimand such officers, the CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, THE NYPD, and their officers, agents, and employees, including the defendants caused the injuries to the plaintiffs through the actions and inactions of defendants OFFICER CAROLYN FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER  (16934), DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER UNIDENTIFIED NEW YORK CITY POLICE OFFICERS.

236.    The failure of the CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, THE NYPD, and their officers, agents, and employees, including the defendants to take action against the defendants OFFICER CAROLYN FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER  (16934), DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER UNIDENTIFIED NEW YORK CITY POLICE OFFICERS involved in this incident and in other similar incidents was part of a custom, practice and procedure of neglect and deliberate indifference that directly caused the injuries to the PLAINTIFF.

237.    The failure of the CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, THE NYPD, and their officers, agents, and employees, including the defendants to supervise and train the defendants OFFICER CAROLYN FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER  (16934), DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER UNIDENTIFIED NEW YORK CITY POLICE OFFICERS involved in this incident and in other similar incidents was part of a custom, practice and procedure of neglect and deliberate indifference that directly caused the injuries to the PLAINTIFF.

238.    The failure of the CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, THE NYPD, and their officers, agents, and employees, including the defendants to supervise, train, and take action against the defendants OFFICER CAROLYN FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER (16934), DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER UNIDENTIFIED NEW YORK CITY POLICE OFFICERS involved in this incident and in other similar incidents constituted a custom, policy and practice which renders the Defendants, THE CITY and the NYPD, liable to PLAINTIFF as a "Person" acting under the color of state law.

239.    These customs, policies and practices were enforced by THE CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, the NYPD, and their officers, agents, and employees, who issued instructions to NYPD officers, agents, and employees, including the Defendants  OFFICER CAROLYN FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER  (16934), DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER UNIDENTIFIED NEW YORK CITY POLICE OFFICERS, and these customs, policies and practices were the

moving force, proximate cause, or affirmative link behind the conduct causing PLAINTIFF'S injuries.

240. THE CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, and the NYPD are therefore liable for violations of the plaintiffs' constitutional rights as caused by OFFICER CAROLYN FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER (16934), DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER UNIDENTIFIED NEW YORK CITY POLICE OFFICERS, as described in more detail in the foregoing paragraphs; and the PLAINTIFF has suffered damages therefrom.

241. As a proximate result of the unconstitutional customs, policies and practices of THE CITY OF NEW YORK, POLICE COMMISSIONER RAYMOND KELLY, and the NYPD, including the failure to supervise and train the defendants OFFICER CAROLYN FANALE, OFFICER STEVEN BOBBETT, OFFICER LUIS MORTIMER (16934), DEPUTY INSPECTOR THOMAS GRAHAM and APPROXIMATELY 34 OTHER UNIDENTIFIED NEW YORK CITY POLICE OFFICERS involved in this incident, the PLAINTIFF was deprived of their constitutional rights, were injured, caused to incur attorneys' fees, associated legal expenses and other special damages, and have suffered great mental anguish, all to PLAINTIFF'S damage in a sum to be provided at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus attorney's fees.

SEVENTH CAUSE OF ACTION
*FOURTH AMENDMENT*

242.    The Plaintiff repeats and realleges each and every allegation set forth in those paragraphs of the complaint marked and numbered previously with the same force and effect as if more fully set forth at length herein.

243.    Defendants, collectively and individually, attempted to enter, and entered, the TIME'S UP! premises at 49 East Houston Street without probable cause and without a warrant, in violation of TIME'S UP! Fourth Amendment rights.

244.    Defendants, collectively and individually, attempted to enter, and entered, the TIME'S UP! premises without identifying themselves as police officers, without stating the nature and purpose and despite the lawful refusal of permission to enter by TIME'S UP!.

245.    Defendants, collectively and individually, used unreasonable and unwarranted force, striking, pushing and grabbing those inside with their fists, arms and bodies, causing injury to members and associates of TIME'S UP!.

246.    Defendants, collectively and individually, subsequently caused the doors to 49 East Houston Street to be blocked, prevent anyone from entering or leaving the premises.  Upon information and belief, defendants maintain their blockade of the premises for a period of several hours.

247.    Defendants, collectively and individually, caused fear and panic among the members and associates of TIME'S UP! present within 49 East Houston St.

248.    Upon information and belief, the actions of the defendants caused some frightened members and associates of TIME'S UP! to flee the premises by a back window, creating an unreasonably dangerous situation, and risk of substantial harm to TIME'S UP!, its members, and associates.

249.    As a proximate result of the unconstitutional conduct of the defendants, the PLAINTIFF was injured, caused to incur attorneys' fees, associated legal expenses and other special damages, and have suffered great mental anguish, all to plaintiff's damage in a sum to be provided at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus attorney's fees.

### EIGHTH CAUSE OF ACTION
*FIRST AMENDMENT CLAIM*

250.    The  PLAINTIFF repeats and realleges each and every allegation set forth in those paragraphs of the complaint marked and numbered previously with the same force and effect as if more fully set forth at length herein.

251.    In assaulting, imprisoning, arresting, obstructing entry and exit to the Times UP! space, creating vehicular traffic in front of the Times UP! space and by ticketing its neighbors,  the defendants violated the Plaintiff's right to assemble peaceably.

252.    In assaulting, imprisoning, arresting, obstructing entry and exit to the Times UP! space, creating vehicular traffic in front of the Times UP! space and by ticketing its neighbors,  the defendants violated the Plaintiff's right to free speech.

253.    In assaulting, imprisoning, arresting, obstructing entry and exit to the Times UP! space, creating vehicular traffic in front of the Times UP! space and by ticketing its neighbors,  the defendants violated Plaintiff's right to petition the government for a redress of grievances.

254.    These actions of the defendants, and disrupted, hindered, prevented, and interfered with TIME'S UP! lawful assembly at the premises.

255.    As a direct and proximate result of these actions, Defendants, collectively and individually, frustrated the goals and purposes of the assembly, including making an expressive show and declaration of support for the goals of TIME'S UP!, having a meeting of members and associates of TIME"S UP!, engaging in speech related to the goals of TIME'S UP!, raising funds for TIME'S UP! operations and activities, building and maintaining goodwill between TIME'S UP! and its members and associates, engaging in and planning educational and other activities, and maintaining and enhancing TIME'S UP! reputation among its members, associates, and members of the general public.

256.    As a direct and proximate result of these actions, Defendants, collectively and individually, deprived TIME'S UP! of its right to peaceably assemble.

257.    As a direct and proximate result of these actions, Defendants, collectively and individually, deprived TIME'S UP! of its right to engage in protected speech activities.

258.    As a direct and proximate result of these actions, TIME'S UP! has been damaged by loss of funds that would have been raised but for the defendants' actions.

259.    As a direct and proximate result of these actions, TIME'S UP! has been damaged by loss of reputation and goodwill among its members and associates, and members of the general public.

260.    As a direct and proximate result of these actions, TIME'S UP! has been damaged by the need to expend time, effort, and money in its own legal defense, and in the defense of its members and associates.

261.    As a direct and proximate result of these actions, TIME'S UP! has been damaged by the need to expend time, effort, and money in order to attempt to restore its reputation and goodwill among its members and associates and among the general public.

262.    By limiting the funds that could be raised, the defendants have chilled TIME'S UP! ability to conduct expressive activities protected by the First Amendment.

263.    By closing down Houston Street, attempting to illegally enter the TIME'S UP! space, unlawfully imprisoning party guests and prospective TIME'S UP! members, the defendants have harmed TIME'S UP! and its ability to attract new members, expand its membership base and expand its expressive activities.

264.    As a proximate result of the unconstitutional conduct of the defendants, the PLAINTIFF was injured and harmed in their ability to conduct, and participate in, expressive activity and to freely and legally associate with others and other special damages,  all to the Plaintiff's damage in a sum to be provided at trial but not less than FIVE MILLION DOLLARS ($5,000,000.00), plus attorney's fees.

NINNTH CAUSE OF ACTION
CLAIM BROUGHT BY TIME'S UP ON BEHALF OF ITS MEMBERS
(ASSOCIATIONAL STANDING)

265.    The  PLAINTIFF repeats and realleges each and every allegation set forth in those paragraphs of the complaint marked and numbered previously with the same force and effect as if more fully set forth at length herein.

266.    In assaulting , imprisoning, arresting, obstructing entry and exit to the Times UP! space, creating vehicular traffic in front of the Times UP! space and by

ticketing its neighbors, the defendants violated the rights of members and associates of TIME'S UP! to assemble peaceably.

267. In assaulting , imprisoning, arresting, obstructing entry and exit to the Times UP! space, creating vehicular traffic in front of the Times UP! space and by ticketing its neighbors, the defendants violated the rights of members and associates of TIME'S UP! to free speech.

268. In assaulting , imprisoning, arresting, obstructing entry and exit to the Times UP! space, creating vehicular traffic in front of the Times UP! space and by ticketing its neighbors, the defendants violated the rights of members and associates of TIME'S UP! to petition the government for a redress of grievances.

269. These actions of the defendants, disrupted, hindered, prevented, and interfered with the rights of members and associates of TIME'S UP! to lawful assembly at the premises.

270. As a direct and proximate result of these actions, Defendants, collectively and individually, frustrated the goals and purposes of the assembly, including making an expressive show and declaration of support for the goals of TIME'S UP!, having a meeting of members and associates of TIME'S UP!, engaging in speech related to the goals of TIME'S UP!.

271. As a direct and proximate result of these actions, Defendants, collectively and individually, deprived members and associates of TIME'S UP! of their right to peaceably assemble.

272. As a direct and proximate result of these actions, Defendants, collectively and individually, deprived members and associates of TIME'S UP! of their right to engage in protected speech activities.

273.   As a direct and proximate result of these actions, members and associates of TIME'S UP! have been damaged by the aforesaid deprivation of their rights to speech and assembly.

274.   As a direct and proximate result of these actions, members and associates of TIME'S UP! have been damaged by the public disapprobation, disgrace and loss of reputation that Defendants' actions cast upon members and associates of TIME'S UP!.

275.   As a direct and proximate result of these actions, members and associates of TIME'S UP! have been discouraged from further exercise of their rights to speech and assembly as members and associates of TIME'S UP!.

276.   As a proximate result of the unconstitutional conduct of the defendants, members and associates of TIME'S UP! were injured and harmed in their ability to conduct, and participate in, expressive activity and to freely and legally associate with others, and suffered special damages, in a sum to be determined at trial.

277.   Upon information and belief, members and associates of TIME'S UP! are unable to seek relief on their own behalf, or have been deterred from seeking relief by Defendants' own actions.

278.   As a consequence, TIME'S UP! seeks recovery of these aforesaid damages on behalf of its members and associates.

**WHEREFORE**, the Plaintiffs respectfully demand and seek judgment against each defendant, jointly and severally:

[a]     As to cause of action 1: awarding damages in an amount to be determined at trial but not less than Five Million dollars to the Plaintiff;

[b]     As to cause of action 2: awarding damages in an amount to be determined at trial but not less than Five Million dollars to the Plaintiff;

[c]     As to cause of action 3: awarding damages in an amount to be determined at trial but not less than Five Million dollars to the Plaintiff;

[d]    As to cause of action 4: awarding damages in an amount to be determined at trial but not less than Five Million dollars to the Plaintiff;

[e]    As to cause of action 5: awarding damages in an amount to be determined at trial but not less than Five Million dollars to the Plaintiff;

[f]    As to cause of action 6: awarding damages in an amount to be determined at trial but not less than Five Million dollars to the Plaintiff;

[g]    As to cause of action 7: awarding damages in an amount to be determined at trial but not less than Five Million dollars to the Plaintiff;

[h]    As to cause of action 8: awarding damages in an amount to be determined at trial  but not less than Five Million dollars to the Plaintiff;

[i]    As to cause of action 9: awarding damages in an amount to be determined at trial but not less than Five Million dollars to the Plaintiff;

[j]     Awarding the costs, legal and attorneys fees, interest and disbursements of this action, together with such other and further relief as this Court deems just and proper.

Dated:    New York, New York
          October 25, 2007

_____
Wylie M. Stecklow, Esq. (WMS 6012)
WYLIE LAW
10 SPRING – N Y C   10012
(212) 566-8000

TO:    Arthur Larkin, Esq.
       Corporation Counsel
       Attorneys for Defendants
       100 Church Street
       New York, NY 10007-2601