UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

TIME'S UP, INC.,

                          Plaintiff,

         -against-

THE CITY OF NEW YORK, COMMISSIONER OF THE
CITY POLICE DEPARTMENT RAY KELLY, OFFICER
CAROLYN FANALE, OFFICER STEVEN BOBBETT,
OFFICER LUIS MORTIMER, DEPUTY INSPECTOR
THOMAS GRAHAM, and APPROXIMATELY 34
OTHER UNIDENTIFIED NEW YORK CITY POLICE
OFFICERS,

                          Defendants.

------------------------------------------------------------------------ x

**DECLARATION**

07-CV-9557 (PAC)

ARTHUR G. LARKIN, for his declaration pursuant to 28 U.S.C. § 1746, states:

1.      I am a Senior Counsel at the New York City Law Department and I am admitted to practice before the bar of this Court.  I make this declaration in support of defendant City of New York's motion to dismiss the complaint in its entirety, with prejudice, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  I am fully familiar with the matters set forth below.

2.      Below is a list of exhibits attached to this declaration:

| | |
|---|---|
| Exhibit A | Summary of CCRB Statement – Amy Starecheski |
| Exhibit B | Summary of CCRB Statement – Laura Starecheski |
| Exhibit C | Summary of CCRB Statement – Mandy Hu |
| Exhibit D | Summary of CCRB Statement – Carolyn Fanale |
| Exhibit E | Summary of CCRB Statement – Kenneth Gorodovich |

3.      Our office has inquired of the New York State Liquor Authority to determine if Time's Up or any other person or entity with an address at 49 East Houston Street owns a liquor license, and we have learned that the answer is no.  A paralegal in my office, Ms. Tenisha Hilsman, telephoned the State Liquor Authority on or about Nov. 13, 2006, and spoke with Michael Smith (518-473-2147), who advised that no liquor license is assigned to Time's Up or the address 49 East Houston Street.

4.      Our office also has inquired of the New York City Department of Consumer Affairs ("DCA") to determine if "Time's Up" or any other person or entity with an address at 49 East Houston Street owns a cabaret license.  We have learned that no such license exists.  On or about June 26, 2007, Ms. Hilsman spoke to a DCA representative, reached at 212-487-4100, who confirmed this information.

5.      I have reviewed the four videotapes produced in the matter captioned Tahira Alford v. City of New York, et al., 06-CV-2512 (PAC), by the same attorney who represents plaintiff here.  The Alford lawsuit also concerns the party held at Time's Up on the night of Oct. 29-30, 2004.  The tape labeled "Tape # 2" shows at approximately 11:43 p.m. to 11:45 p.m. the inside of the Time's Up space on Oct. 29, 2004.  It appears from the tape that patrons inside the premises are drinking beer from bottles.  We can make this tape available for the Court's review should the Court request it.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in New York, New York, on January 14, 2008.

ARTHUR G. LARKIN (AL 9059)

# EXHIBIT A

*CCRB*
*Mar 14, 2005*

# Interview Sheet (Civilian)

## General Details

Case # :          200411070

Investigator :    Nicholas Marantz

Interview Date :  12/14/2004          Start Time : 10:40 AM    End Time : 11:15 AM

Interview Mode : Person

Location :        CCRB

Tape # :                                               Side :        Tape Seq # :

## Civilian Interviewed

Name :        Amy Starecheski

Address :

Contacts :        Phone(home):  -   -        Phone(work):  -   -        Extn:
                  Phone(cell): 917-693-9870        E-mail:

Occupation :      Oral Historian

Employer Name :   Columbia University

Employer Address :

                  New York, NY 10027

## Statistical Data on the Person Interviewed

Birth Date :    08/01/1977        Sex :      Female        Race :    White

Height :        5' 6"             Weight :   140

Hair Color :    Brown             Eye Color : Brown        Other :

Person Present : Amy Starecheski; Marantz, CCRB

Remarks :

CONFIDENTIAL                                   ENCL.    22a

## Interview Details

Amy Starecheski was, a –year-old oral historian employed by Columbia University, was interviewed in the Lehman Library at Columbia University on December 14, 2004. On the evening of October 29, 2004, Ms. Starecheski participated in a Critical Mass bike ride. Following the ride, a group called Time's Up had a party in their space at 49 East Houston Street. Ms. Starecheski went to the party at 9:00 PM. At the peak of the party, 40-50 people were on the ground floor. (There is also a basement.) It was not loud in the space, and Ms. Starecheski had no trouble holding conversations. At around 12:00 AM, Ms. Starecheski saw flashing lights through the windows of the space. Between 9:00 PM and 12:00 AM, Ms. Starecheski had consumed approximately four drinks. She had eaten just before arriving at the party. She described her state of mind at 12:00 AM as seven on a scale of one to ten, with ten being the most clearheaded. The party was not very crowded at this time. Approximately 20-30 people were on the ground floor.

Ms. Starecheski looked outside and saw police cars. She was not standing directly by the front doors, but less than ten minutes later, she heard a commotion and later learned that police had tried to come through the doors. The group inside either pushed the officers back, or told them that they could not enter the premises. The group inside began chanting, "We do not consent to a search." Ms. Starecheski asked people by the front door whether the police were permitting the party-goers to leave through that door. Someone confirmed this to be the case, so Ms. Starecheski, her sister Laura Starecheski, their friend Mandy Hu, and an additional woman who Ms. Starecheski did not wish to identify (she is the roommate of Laura Starecheski and Mandy Hu) left.

Ms. Hu asked a male officer in uniform (whose appearance she did not recall) what was going on, what the officers wanted the women to do, and why the officers were there. Ms. Hu seemed scared, but she was not aggressive. The unidentified woman walked away, but the two Starecheski sisters and Ms. Hu were surrounded by ten to fifteen police officers who pushed them from both sides. The officers stood to the right, left, and front of Ms. Starecheski and her associates. They did not have their batons drawn. Ms. Starecheski did not see any other civilians outside at this time. The officers told them to move, but prevented them from doing so by pushing in opposite directions. Ms. Hu was asking what the officers wanted them to do, and an officer pushed her on her breasts. Ms. Hu became upset and said, "Don't touch my breasts," and an officer said, "Arrest her."

Officers, who Ms. Starecheski could not identify, grabbed her and Ms. Hu at the same time. Ms. Starecheski was pushed down, but did not go all the way to the ground. She had been standing in one spot the whole time and had not said anything to the officers. She did not see the arrest of Laura Starecheski. She was then placed in a van and taken to the 5th Precinct stationhouse. Tahira Alford were already in the van when Ms. Starecheski was placed in the van. Ms. Starecheski had not witnessed her arrest. Paul Zulkowitz and a German man identified by investigation as Lutz Lahann were placed in the van after Ms. Starecheski. At approximately 3:00 AM, she was released from the 5th Precinct stationhouse with a desk appearance ticket. Ms. Starecheski had not discussed the incident with Ms. Hu at the time of the interview. Ms. Starecheski subsequently learned the identity of Lieutenant Carolyn Fanale and saw her in the 5th Precinct stationhouse, but did not see her at the scene of the incident. Ms. Starecheski's desk appearance ticket indicates that the arresting officer was Wayne Ellis, Tax #932602

ENCL. 226

*CONFIDENTIAL*

00116



## CIVILIAN COMPLAINT REVIEW BOARD
40 RECTOR STREET, 2ND FLOOR
NEW YORK, NEW YORK 10006 ♦ TELEPHONE (212) 442-8833
www.nyc.gov/ccrb

MICHAEL R. BLOOMBERG
MAYOR

FLORENCE L. FINKLE
EXECUTIVE DIRECTOR

## VERIFICATION

STATE OF NEW YORK:

§

COUNTY OF NEW YORK:

I, Amy Starecheski, being duly sworn, depose and say: I am a witness in the Civilian Complaint Review Board complaint numbered 200411070; any and all statements I have made in connection therewith are true to my knowledge.

_____
Signature

Sworn to before me

14<sup>7th</sup> day of _____, 200 7

_____
Commissioner of Deeds

NICHOLAS J. MARANTZ
Commissioner of Deeds
City of New York No. 2-12545
Certificate Filed in New York County
Commission Expires Oct. 1, 2008

ENCL.    22c

*CONFIDENTIAL*

# EXHIBIT B

2 0 6

*CCRB*
*Mar 15, 2005*

# Interview Sheet (Civilian)

## General Details

**Case # :**          200411070

**Investigator :**    Nicholas Marantz

**Interview Date :**  02/02/2005          **Start Time :** 11:30 AM     **End Time :** 12:10 PM

**Interview Mode :**  Person

**Location :**        CCRB

**Tape # :**                                              **Side :**          **Tape Seq # :**

## Civilian Interviewed

**Name :**             Laura Starecheski

**Address :**          2092 8th Avenue
                       New York, NY 10026

**Contacts :**         Phone(home): 212-531-2575     Phone(work):  -  -          Extn:
                       Phone(cell):  -  -            E-mail:

**Occupation :**       Adjunct College Lab

**Employer Name :**    BMCC

**Employer Address :** 199 Chambers Streetsuite S-510
                       New York, NY 10013

## Statistical Data on the Person Interviewed

**Birth Date :**   06/05/1979        **Sex :**     Female       **Race :**   White

**Height :**       5' 7"             **Weight :**  125

**Hair Color :**   Brown             **Eye Color :** Brown       **Other :**

**Person Present :**  Laura Starecheski; Marantz, CCRB

**Remarks :**

*Complaint Tracking System*

CONFIDENTIAL

ENCL 25a

## Interview Details

Laura Starecheski, a twenty-five-year-old white female currently employed as a teacher for Borough of Manhattan Community College, was interviewed at the CCRB on February 2, 2005. On October 29, 2004, Ms. Starecheski arrived at 49 East Houston Street between 9:30 and 10:30 PM. She, her sister Amy Starecheski, their friend Mandy Hu, and a fourth person who Ms. Starecheski did not wish to identify had come directly from Critical Mass bike ride. A party with music and dancing was being held at the headquarters of Time's Up, a non-profit environmental group. The party was not crowded and was no louder than a bar. Ms. Starecheski did not go to the basement of the space.

At around 1:00 AM she noticed police lights flashing outside and saw a few marked police vehicles. A few minutes later, some police officers tried to force their way inside of the space. The people inside blocked the doors with a table and said, "We do not consent to a search." After several seconds, the police retreated outside onto the sidewalk. Laura Starecheski saw these officers, but could not confidently describe them and did not think that she could identify them from photos. A group of police was standing outside the doors, lining the sidewalk and facing the street. Laura Starecheski and her friends decided to leave. At first, Laura Starecheski had the impression that the officers were not permitting people to leave. She never heard this explicitly stated. She then heard that they would be allowed to leave, but would not be allowed back in. They exited through the front doors. This was the first time they had left the building since arriving at the party.

Laura Starecheski did not speak to any officers, but Mandy Hu and Amy Starecheski were conversing with the officers, asking what they were responding to. The officer who spoke with Mandy was a stocky (not overweight) white male, 5'7" or shorter, with dark hair, and a dark moustache. Ms. Starecheski did not recall his eye color. He was standing directly outside of the door to the Time's Up space on the east side of the door. Mandy asked, "What is your purpose in being here?" and "Do you really think this is the right thing for you to be spending your time doing?" He said that an officer had called for assistance and these officers responded. Laura Starecheski thought that a few other partygoers were outside at this time, but she could not identify them. Five to ten officers were lined up in front of the building. They were facing the street, with their backs to the building, uniformly arranged on both sides of the door to the Time's Up space.

After fewer than five minutes, many more police vehicles, including a couple of vans, pulled up. Ten to twenty officers exited. The officer with whom Mandy had been speaking said something like, "OK, now we're really clearing the sidewalk, so you guys had better move." The women started to walk away. There were so many people present that it was not possible to walk quickly. Police were coming from the west and the east. Amy and Mandy continued to ask why the officers were clearing the sidewalk, and stated that it was a public sidewalk. Officers started guiding the women with their hands and then started shoving the women. A tall black male officer, whose name Laura Starecheski remembered as "Walker" shoved Mandy on her chest, touching her breasts. He was facing east and she was facing west at this time. Mandy said, "Don't touch my breasts, don't shove me." Mandy was addressing the officers by name, and Laura Starecheski heard her say "Walker" at this time. Amy Starecheski was also facing west at this time, because she, like Mandy Hu, was still talking to the officers. Laura Starecheski was facing in the same direction as her sister and Ms. Hu, because she wanted to keep them in her sight. All three women were backpedaling at this point.

An officer said, "Arrest her," indicating Ms. Hu. Laura Starecheski said "No" and reached out to grab Ms. Hu. Officer "Walker" grabbed Ms. Hu by the arm (Laura Starecheski was not sure which arm), and she disappeared from Laura Starecheski's line of sight at this time. Amy Starecheski was then arrested. Laura Starecheski did not see which officers effected this arrest. Unseen officers then grabbed Laura Starecheski and threw her from the sidewalk to the street, where she was handcuffed. She was then put in a police van with the other arrestees. This was the first time that Laura Starecheski saw Tahira Alford and Paul Zulkowitz. She did not see anyone other than Amy Starecheski and Ms. Hu being apprehended.

At the stationhouse, the officer who had pushed Mandy on the street came to the holding cell and said to Mandy, "Hello my friend. You have my handcuffs. I don't want any nicks or scratches on them." At this time, Laura Starecheski read the name "Walker" on this officer's nameplate. At the time of the incident, Laura Starecheski had consumed approximately two drinks over the course of two hours. She was not completely sober, but did not feel drunk. She believed that she was relatively clear-headed. In her notes, written during the day on October 30, 2004, Ms. Starecheski noted that Sergeant Pete Caldero (identified by investigation as Sergeant Peter Calderon) had issued summonses to her, her sister, and Ms. Hu at the 5th Precinct stationhouse. She stated that she had not seen Sergeant Calderon at the scene of the incident. She sustained bruises and abrasions to front of neck and shoulder bones, but did not receive medical treatment and did not document the injuries.

Officer Walker: M/B, approx. 6'00", fit, approx. 35.

Additional Contact Information:

Gary and Tess Starecheski [parents]

ENCL 256

CONFIDENTIAL

00136

## Interview Details

56 Lapierre Drive
Richmond, VT 05477
802-434-7005

Kathryn Bettis [friend]
1120 Echo Park Avenue, Apt. 3
Los Angeles, CA 90026
213-250-4656

ENCL  25c

*CONFIDENTIAL*

00137



ENCL. 25d

CONFIDENTIAL



**CIVILIAN COMPLAINT REVIEW BOARD**
40 RECTOR STREET, 2ND FLOOR
NEW YORK, NEW YORK 10006 ♦ TELEPHONE (212) 442-8833
www.nyc.gov/ccrb

MICHAEL R. BLOOMBERG
MAYOR

FLORENCE L. FINKLE
EXECUTIVE DIRECTOR

## VERIFICATION

STATE OF NEW YORK:

§

COUNTY OF NEW YORK:

I, Laura Starecheski, being duly sworn, depose and say: I am a witness in the Civilian Complaint Review Board complaint numbered 200411070; any and all statements I have made in connection therewith are true to my knowledge.

_____
Signature

Sworn to before me

___2ND___ day of _FEBRUARY_ , 200 _5_ ___

_____
Commissioner of Deeds

NICHOLAS J. MARANTZ
Commissioner of Deeds
City of New York No. 2-12545
Certificate Filed in New York County
Commission Expires Oct. 1, 2006

ENCL. 25c

*CONFIDENTIAL*

# EXHIBIT C

*CCRB*
*Dec 13, 2004*

# Interview Sheet (Civilian)

## General Details

**Case # :**            200411070

**Investigator :**       Nicholas Marantz

**Interview Date :** 12/10/2004          **Start Time :** 02:23 PM       **End Time :** 02:51 PM

**Interview Mode :** Person

**Location :**          CCRB

**Tape # :**                                            **Side :**          **Tape Seq # :**

## Civilian Interviewed

**Name :**              Mandy Hu

**Address :**           2092 8th Avenue
                       New York, NY 10026

**Contacts :**         Phone(home): 212-531-2575    Phone(work): 646-358-1469   Extn:
                       Phone(cell): 917-536-1536        E-mail:

**Occupation :**        Vaid Fellow

**Employer Name :**    National Gay and Lesbian Task Force

**Employer Address :** 90 William Streetsuite Suite 1201
                       New York, NY 10038

## Statistical Data on the Person Interviewed

**Birth Date :** 09/29/1980          **Sex :**       Female       **Race :**    Asian

**Height :**      5' 5"                **Weight :**    140

**Hair Color :**  Black                **Eye Color :** Brown       **Other :**

**Person Present :** Mandy Hu; Marantz, CCRB

**Remarks :**

ENCL. 20a

CONFIDENTIAL

00101

## Interview Details

Mandy Hu, a twenty-four-year old female Asian employed as a research fellow at the National Gay and Lesbian Task Force, was interviewed at her office at 90 William Street in Manhattan on December 10, 2004. On October 29, 2004, Ms. Hu arrived at the Time's Up storefront at approximately 9:30 PM and remained inside until approximately 12:30 PM. At this time, she noticed lights flashing against the back wall of the space and realized that police officers were attempting to enter. Ms. Hu saw the top of the front door open, and heard the crowd chanting, "We do not consent to a search." She could not see over the crowd to determine who was attempting to enter the space. (The crowd had thinned out somewhat, although earlier the space had been quite crowded.) Ms. Hu decided to leave with her friends, Laura and Amy Starecheski, with whom she had come to the party, because she did not want to get involved with the police. She had consumed two drinks over the course of three hours, and was clearheaded.

As Ms. Hu exited, she spoke with a uniformed officer standing in front of the door (W/M, 5'8"-6'0", uniformed, black / brown hair) who informed her that, once she departed, she would not be permitted to return. Ms. Hu asked what was happening, and the officer told her that he could not disclose any information. He told her that he was being nice, but that the other officers would not be as kind, and that she should leave as quickly as possible. Twelve to twenty uniformed officers were forming a column on the west side of the Time's Up space, radiating from the building to the street. A smaller group of officers, including a plainclothes officer in a Redskins jersey who Ms. Hu later learned from friends and media coverage to be Lieutenant Carolyn Fanale, was arrayed on the east side of the space. Ms. Hu did not see Lieutenant Fanale's shield; she did not recall whether Lieutenant Fanale had anything in her mouth. Ms. Hu attempted to head east, but the crowd of civilians in front of the space was tightly packed. The officers on the west side started pushing them to the east.

Upon direct questioning, Ms. Hu acknowledged that she turned around and, in a loud manner, asked the officers what they were doing. An officer who Ms. Hu could not see very well (male in uniform, race unknown, possibly with a goatee or some facial hair, possibly approximately 6'00" or more, medium build with a bulky upper body) pushed her on the chest. Ms. Hu told this officer not to touch her breasts. The officer continued to push her, although not on her chest, and she told him again not to touch her breasts. An officer stated that Ms. Hu should be arrested, and within an instant, she was on the ground and was handcuffed without incident.

Ms. Hu was taken to a van where Tahira Alford and a German male, identified by investigation as Lutz Lahann were seated. (Ms. Hu initially stated that Paul Zulkowitz was in the van at this time, but later stated that he was placed in the van after her.) The Starecheskis followed immediately after her. Ms. Hu did not see either of them getting arrested. Ms. Hu did not converse with any of the officers in the van, although she may have accused an Asian male officer in the van of being a "race traitor." Ms. Hu arrived at the 5th Precinct stationhouse at 1:00 AM. When Ms. Hu was in the holding cell, a dark-skinned male black officer (approx. 5'10"-6'2", medium build, no facial hair, early 30's) said, "Those are my handcuffs, take good care of them." Ms. Hu was released with a pink ticket (identified by investigation as a desk appearance ticket), which indicated an Officer Walker as the arresting officer. Note: the sound quality of the interview tape is very poor.

ENCL. 20b

CONFIDENTIAL

00102





**CIVILIAN COMPLAINT REVIEW BOARD**
40 RECTOR STREET, 2ND FLOOR
NEW YORK, NEW YORK 10006 ◆ TELEPHONE (212) 442-8833
www.nyc.gov/ccrb

MICHAEL R. BLOOMBERG
MAYOR

FLORENCE L. FINKLE
EXECUTIVE DIRECTOR

## VERIFICATION FORM

STATE OF NEW YORK:

§

COUNTY OF NEW YORK:

I, MANOY1⎯⎯ , being duly sworn, depose and say: I am a witness in connection with Civilian Complaint Review Board case number                          ;
any and all statements I have made in connection therewith are true to my knowledge.

_____
Signature

Sworn to before me on the

_10^{TH}_ day of December, 200Y

_____
Commissioner of Deeds

NICHOLAS J. MARANTL
Commissioner of Deeds
City of New York No. 2-12545
Certificate Filed in New York Court
Commission Expires Oct. 1, 200!

ENCL.  20⌢

*CONFIDENTIAL*

00103

# EXHIBIT D

CCRB
Sep 06, 2005

# Interview Sheet (MOS)

## General Details

Case # :          200411070

Investigator :    Sasha Linney

Interview Date :  08/03/2005        Start Time : 10:10 AM        End Time : 10:33 AM

Interview Mode :  Person

Location :        CCRB

Tape # :          17                                    Side :  A      Tape Seq # :

## MOS Interviewed

Name :            Carolyn Fanale    (Subject Officer)

Tax No :                          Rank :  LT          Shield :  00000

Cmd Code/Desc :   005 / 005 PCT

Partner Name :    PO Jacqueline Peters

Assignment :      Other

Exact Tour :      Unknown

On Duty :         Yes

In Uniform :      No

## Statistical Data on the Person Interviewed

Birth Date :      01/05/1964        Sex :     Female      Race :    White

Height :          5'5"              Weight :  180

Hair Color :      brown             Eye Color : hazel      Other :

Person Present :  Barbara Resnick; Investigators Sasha Linney and
                  Alamanda Gribbin, CCRB; Lt Fanale

Remarks :

*Complaint Tracking System*

ENCL    38.u

*CONFIDENTIAL*

## Interview Details

Lieutenant Carolyn Fanale, of the 5th Precinct, was interviewed at the CCRB on August 3, 2005. Lieutenant Fanale stated that she worked in plainclothes as the 5th Precinct Special Operations Lieutenant on October 29 and October 30, 2004, but she could not recall what hours she worked. She was working with Officer Jacqueline Peters, the driver of a black unmarked Chevy Impala to which they were assigned.

Lieutenant Fanale stated that she lost her original memo book from that tour in the crowd, so she started a new memo book which read:

"2000 hours 10/30/04 New book due to large crowd Level 1 Mobilization while attempting to subdue large crowd book was lost. Delayed entry: 2335 Observed large group into lane of traffic on E Houston approximately 200 people overflowing from IFO 49 E Houston Street large amount of crowd had open containers. Attempted to summons persons w/ open container. Crowd became hostile person being summonsed slapped me 7 times in back of my head. Crown began to surround myself and officers yelling hostilely police some were pointing to me and shouted the 'dyke's undercover 'dyke's undercover' 0018 pulled officers back and called a level 1 mobilization. Capt Duffy on scene. Ordered crowd dispersed after warnings were given over RMP speaker. While attempting to disperse crowd female refused to leave location. While attempting to arrest female she did fight with officer by resisting striking officer in face. Refused to place hands behind her back and kept flailing arms. Female cuffed by officers and placed in van. 0220 1098 1062 at 005th PCT"

Lieutenant Fanale stated that as she and Officer Peters were driving onto East Houston Street from Lafayette Street, she observed a "huge crowd" of about 200 people in front of 49 East Houston Street. Another patrol car simultaneously pulled up at the location; Lieutenant Fanale could not recall what officers were assigned to that car. Upon direct questioning, Lieutenant Fanale could not recall whether they were Officers Gorodovich and Van Name. Lieutenant Fanale did not receive a radio call regarding the crowd; she simply observed it and became aware of it. She observed that the crowd had placed either construction cones or a horse across East Houston Street, blocking one lane of eastbound vehicle traffic. A male was at a corner urinating. People in the crowd were drinking open containers of alcohol and blocking vehicle and pedestrian traffic. It appeared to Lieutenant Fanale that the people had spilled out of 49 East Houston Street, which appeared to be a licensed premise because there were people drinking inside at the bar. Lieutenant Fanale initially thought that the crowd was a part of a Halloween party from the bar at that location, but she eventually realized that they were a part of the Critical Mass bike ride earlier that day.

Lieutenant Fanale's initial purpose was to issue summonses to those drinking outside, and to enter 49 East Houston Street and issue a summons to the owner for having a disorderly premise. She also directed people either to leave the premises or to go inside to a bar. Most people cooperated, but a "good bulk" were uncooperative, especially with getting summonsed. Lieutenant Fanale stated that she does not issue summonses; she did not know whether any summonses were issued because the crowd became very "hostile," "extremely uncooperative," "hostile towards the police," and refusing to leave. People started becoming physically aggressive. An unknown male struck Lieutenant Fanale in the back of the head several times in a rapid fashion. Lieutenant Fanale grabbed the male, escorted him away from the scene, and handed him off to another officer so that he could be placed in the van. Lieutenant Fanale could not recall whether she placed handcuffs on the male. Aside from that, Lieutenant Fanale could not recall the specific ways in which other civilians were hostile.

At some point, Lieutenant Fanale attempted to gain entry into 49 East Houston Street, the Time's Up building, which she believed to be a licensed premise at the time, in order to issue a disorderly premise summons to the owner. Lieutenant Fanale got as far as the threshold of the building, but numerous people pushing her out prevented her entry. Lieutenant Fanale did not use any physical force against any persons at that point, but ordered the officers behind her to retreat. She then called a Level 1 mobilization. Captain John Duffy arrived on the scene almost immediately and became the new commander. Lieutenant Fanale was unable to state how many officers arrived in total. Captain Duffy directed the officers to disperse the crowd. Several different officers made warnings over an RMP loudspeaker that persons would face arrest if they did not clear the area. Still, some persons refused to leave. Lieutenant Fanale recalled that one female refused to leave and also struck another, unknown officer. Lieutenant Fanale stated that she did not have a clear independent recollection of this particular incident; she only recalled this because of the note in her memo book. Lieutenant Fanale was not aware of whether this female was charged with assault. Lieutenant Fanale believed that she escorted her away and handed her off to another officer to handcuff and place in the van. Lieutenant Fanale recalled that the female was "difficult" but she could not recall whether the female was walking freely or if force was necessary to remove her. Lieutenant Fanale recalled that the female was calling her lots of unknown, insulting

ENCL. 38b

*CONFIDENTIAL*

## Interview Details

names. Lieutenant Fanale could not recall whether this female had a camera, identified herself as a reporter, or whether she complained of having lost her camera.

Lieutenant Fanale could not recall exactly when she started to notice bicycles in the area. At some unknown time, she was directed by Inspector Thomas Graham to talk to someone from the Puck Building, as there were numerous bicycles chained to the building. Lieutenant Fanale spoke to the manager of the Puck Building, whose name she could not recall, who said "emphatically" that he did not want bicycles chained to the building. Lieutenant Fanale got the manager's name. ESU officers, who had come as a part of the mobilization, effected the removal of the bicycles. Lieutenant Fanale did not participate in the removal. She recalled that some civilians removed their own bikes if they had keys to the locks.

Lieutenant Fanale stated that she gave cabaret officers instructions to perform premise inspections and issue summonses for any infractions at the two bars on either side of 49 East Houston Street. Cabaret officers did do premise inspections of those locations, related to the disorderly crowd, but Lieutenant Fanale was not aware of whether they encountered any problems or issued any summonses at those locations.

Lieutenant Fanale stated that she does not arrest people. She did not assign any arrests to any officers. She did not witness any officer using any force more than necessary to restrain an individual to handcuff them. She did not witness any officer with his gun drawn.

Lieutenant Fanale did not leave the location until approximately 2:20 a.m., when the location finally got under control. She did not recall interacting with any of the persons from this incident at the stationhouse. Nobody complained of injuries to her.

Lieutenant Fanale was shown photograph #2, but she was unable to tell what is going on in the photograph. She was also shown photograph #7, but she was unable to identify the male in the red shirt, or the officer to the left of the photograph. Lieutenant Fanale stated that she does not know who Officer Walker is.

ENCL.    38c

*CONFIDENTIAL*

00184

# EXHIBIT E

*CCRB*
*Sep 06, 2005*

# Interview Sheet (MOS)

## General Details

**Case # :**              200411070

**Investigator :**        Sasha Linney

**Interview Date :**      07/29/2005        **Start Time :** 09:22 AM        **End Time :** 09:33 AM

**Interview Mode :**      Person

**Location :**            CCRB

**Tape # :**              16                                     **Side :** A        **Tape Seq # :**

## MOS Interviewed

**Name :**                Kenneth Gorodovich    (Subject Officer)

**Tax No :**                              **Rank :** POM        **Shield :** 05387

**Cmd Code/Desc :**       005 / 005 PCT

**Partner Name :**        PO Van Name

**Assignment :**          Comm. Sector

**Exact Tour :**          2315 x 0750

**On Duty :**             Yes

**In Uniform :**          Yes

## Statistical Data on the Person Interviewed

**Birth Date :**    04/24/1970        **Sex :**        Male        **Race :**    White

**Height :**        6'2"              **Weight :**     210

**Hair Color :**    brown             **Eye Color :** brown        **Other :**

**Person Present :** Peggy Sanchez, PBA; Investigator Alamanda
Gribbin; Investigator Sasha Linney; PO Gorodovich

**Remarks :**

ENCL.    58a

*CONFIDENTIAL*

00223

## Interview Details

Officer Kenneth Gorodovich, of the 5th Precinct, was interviewed at the CCRB on July 29, 2005. Officer Gorodovich stated that he worked in uniform from 11:15 p.m. on October 29, 2004 to 7:50 a.m. the following day. He was working with Officer Randy Van Name, who has since retired from the department, assigned to patrol sector AF in marked RMP number 1534. Officer Gorodovich had entries in his memo book regarding this incident.

Officer Gorodovich stated that at approximately 11:55 p.m. he was on patrol with Officer Van Name. They drove north on Mulberry Street and then headed east on East Houston Street, at which time they observed a large crowd of about 150 to 200 people in costume. They had placed a construction barrier in front of 49 East Houston Street, which is between Mott and Mulberry Streets, blocking the full length of East Houston Street. The people were blocking vehicle and pedestrian traffic. There was music coming from 49 East Houston Street, the Time's Up building. Patrons of 49 East Houston Street were drinking beer and mixed drinks from open containers. There was a large pile of bikes just east of 49 East Houston Street. Officer Gorodovich stated that he was "sure" bikes were chained in other places, but he did not make particular note of them.

Officers Gorodovich and Van Name called a crowd condition over the radio. They began verbally commanding people to move into the Time's Up building in order to clear up traffic. Officer Gorodovich did not have any physical contact with any persons. Some people were cooperative, but the majority was not cooperative; they remained in the street and on the sidewalk, yelling and screaming. Lieutenant Fanale arrived with her driver; Officer Gorodovich could not recall who that officer was. When she arrived, the officers continued trying to clear the area by directing people inside 49 East Houston Street. The majority of people refused to move, causing the street to be "very congested."

Officer Gorodovich stated that it took about an hour to clear the street. He recalled that there were so many people that he was going to different groups of people and giving them verbal commands. Officer Gorodovich did not affect the arrest of any individual, nor did he witness the arrest of any individual. About 15 officers, from the 5th Precinct and from other commands, arrived in total. Officer Gorodovich believed that no officers ranking higher than Lieutenant Fanale arrived. He did not witness any officers enter any buildings. Officer Gorodovich lost sight of Lieutenant Fanale; he did not witness her enter any building. Officer Gorodovich did not later learn that Lieutenant Fanale entered any building. Officer Gorodovich did not witness Lieutenant Fanale involved in any kind of struggle; he did not later hear anything about her being struck in the face. Officer Gorodovich knew that some officers had problems with some of the people, but he could not be more specific about the problems, as he did not witness any of it. Officer Gorodovich did not know anything about bicycles chained to the Puck Building. Officer Gorodovich did not witness any officer with his gun drawn.

After the crowd was under control, Officer Gorodovich went back on patrol. He returned to the stationhouse, according to his memo book, at 5:05 a.m. and remained there until 6:05 a.m. He did not recognize any civilians there from this incident.

ENCL. 58b

*CONFIDENTIAL*

00225