PRELIMINARY STATEMENT

Alleging a 1983 claim requires two elements: (1) the conduct in controversy must be committed by a person acting under color of state law, and (2) the conduct must deprive the plaintiff of rights, privileges, or immunities secured by the Constitution or the laws of the United States. Gomez v. Toledo, 446 U.S. 635, 100 S. Ct. 1920, 64 L. Ed. 2d 572 (1980).   The Supreme Court has held that even a one-time decision by a State Actor can satisfy the first element of a 1983 claim.

> [I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. If the decision to adopt a particular course of action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.

Pembaur v. Cincinnati, 475 U.S. 469, 477-481 (1986). Moreover, Section 1983 is not a source of substantive rights but a method for vindication of federal rights elsewhere conferred. Baker v. McCollan, 443 U.S. 137, n3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979).

Proper standing in Federal Court requires the purported allegation of the following three elements:

> The Article III component to standing requires that a Plaintiff allege he has suffered actual or threatened injury at the hands of the defendant, Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60L.Ed.2d 66 (1976), fairly traceable to the allegedly unlawful conduct, Duke Power Co. v. Carolina Environmental Study Group, 438 U.S. 59, 72, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), and likely to be redressed by the requested relief. Simon v. Eastern Kentucky Welfare Rights Org., 426 U.S. 26, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

Smith v. Meese, 821 F.2d 1484, 1493 (11th Cir. 1987)

The harm suffered need not be a monetary damage. "That the alleged harm affects the organization's noneconomic interests – for example, its interest in encouraging open housing – 'does not deprive the organization of standing.'" Spann v. Colonial Village Inc,

899 F.2d 24, 27 (DC Cir. 1990), *quoting* Havens Realty v. Coleman, 455 US 363, 102

S.Ct. 1114, 71 L.Ed.2d  214 (1982)

The Time's UP complaint alleges[1] that the actionable conduct occurred on

October 29, 2004, and was authorized and ordered by the top levels of the NYPD.

Time's UP further alleges that this conduct actually harmed it by depriving Time's UP of

certain Constitutional rights such as First Amendment freedoms of association and

expressive speech.   By this lawsuit, Time's UP seeks monetary compensation for the

harm it has suffered.

**I.      Time's Up is an appropriate Plaintiff to Seek Redress for Wrongs
          Committed by the NYPD upon Times UP**

It is undisputed that an association has standing in its own right to seek judicial

relief from injury to itself and to vindicate whatever rights and immunities the association

itself may enjoy.    NAACP v. Alabama, 357 US 449, 458-60, 78 S.Ct. 1163, 2 L.Ed.2d

1488 (1958), Anti-Fascist Committee v. McGrath, 341 US 123, 183-87, 71 S. Ct. 624, 95

L.Ed. 817 (1951); Havens Realty v. Coleman, 455 US 363, 102 S.Ct. 1114, 71 L.Ed.2d

214 (1982) ("We have previously recognized that organizations are entitled to sue on

their own behalf for injuries they have sustained.") *citing*  Warth v. Seldin, 422 US 490,

511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Further, corporations such as Time's UP enjoy Constitutional rights, and courts,

as a matter of course, grant relief for deprivation of such rights.  See Wedges/Ledges,

Calif. v. City of Phoenix, Ariz., 24 F.3d 56 (9th Cir. 1994) (noting that a corporation is a

"legal person" and that, as such, it is to be afforded "…no lesser protections under the

Constitution than individuals…") (internal citations omitted); San Bernardino Physicians'

Services Medical Corp, Inc. v. San Bernardino County, 825 F.2d 1404, 1407 (9th Cir

---

[1] As the Court is aware, and as Defendant states in its Motion to Dismiss, all of Plaintiff's allegations are to be taken as true for purposes of the instant motion.

2

1987) ("A corporation…is a `person' possessing Fourteenth Amendment due process rights.") *citing* <u>First National Bank v. Bellotti</u>, 435 U.S. 765, 98 S Ct 1407, 55 L Ed 2d 707 (1978)).  <u>See also</u> <u>Parkway Garage  v. City Of Philadelphia</u>, 5 F.3d 685 (3rd Cir. 1993) (Reversing a JNOV that was granted in favor of Defendant City and reinstating the jury verdict in favor of Parkway Garage on 1983 action that alleged State Actors conspired to close the parking garage).

In the instant matter, as set out below and in the Complaint, the wrongful conduct of the NYPD injured Time's Up by, *inter alia*, depriving it of its rights and interests protected under the First, Fourth and Fourteenth Amendments of the Constitution. Time's UP has standing to seek relief for violation of all such rights.  *See* <u>Havens</u> at 378-379; <u>Warth</u> at 511.  Accordingly, Defendant's Motion to Dismiss should be denied.  *See* <u>Financial Management Professional Corp. v. USA</u>, 1988 U.S. Dist. LEXIS 10817 (EDPA, Sept 23, 1988, J. Necomber) (denying motion to dismiss where IRS violated Constitutional rights of plaintiff tax preparation corporation).

## II.    First Amendment:  Retaliation by NYPD for First Amendment Protected Expressive Activity is Alleged & Actionable

It is unconstitutional for public officials to retaliate against an organization due to its expressive activity.  "It is well established that 'retaliation by public officials against the exercise of First Amendment rights is itself a violation of the First Amendment." <u>Hillside Productions, Inc. v. Duchane</u>, 249 F.Supp.2d 880 (E.D.Mich. 2003), *citing* <u>Zilich v. Longo,</u> 34 F.3d 359, 364 (6th Cir. 1994) *cert. denied*, 514 U.S. 1036, 115 S.Ct. 1400, 131 L.Ed.2d 288 (1995).  To state a First Amendment retaliation claim, a Plaintiff must allege three elements.  Within the Second Circuit, the first two elements are well-settled while the third element is not. The first two elements are:   (1) Plaintiff has an interest

protected by the First Amendment, and; (2) [2] defendant's actions were motivated or substantially caused by Plaintiff's exercise of that right. As to the third element the Second Circuit is split between the "objective" and the "subjective" standard;

> We note that cases from the Second Circuit appear to take contradictory positions. Compare Washington v. County of Rockland, 373 F.3d 310, 320 (2d Cir. 2004) (objective standard)[3] with Curley v. Village of Suffern, 268 F.3d 65, 73 (2d Cir. 2001) (subjective standard)[4] …. The vast majority of cases apply the objective test.

> Bennett v. Hendrix, 423 F.3d 1247, 1251 (11th Cir. 2005).

In adopting the objective standard, the Eleventh Circuit was influenced by a factor greater than their recognition that every other Circuit had adopted the objective "ordinary firmness" test. Id.   They framed the rationale of utilizing the objective standard as a fairness of notice to the State Actor.

> [W]e are persuaded not only by the number of courts applying the "ordinary firmness" test, but by the reasoning of those decisions as well. An objective standard provides notice to government officials of when their retaliatory actions violate a plaintiff's First Amendment rights. In contrast, 'a subjective standard would expose public officials to liability in some cases, but not in others, for the very  same conduct, depending upon the plaintiff's will to fight.' Constantine v. Rectors, George Mason Univ., 411 F.3d 474, 500 (4th Cir. 2005). '[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity. . . .' Mendocino Environ. Ctr. v. Mendocino County, 192 F.3d 1283, 1300 (9th Cir. 1999).

> Bennett v. Hendrix, 423 F.3d 1247, 1251-1252 (11th Cir. 2005).

---

[2] The Second Circuit has stated in reference to the second element, "the particularized evidence of improper motive may include . . . circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or **the highly unusual nature of the actions taken**." Blue v. Koren, 72 F.3d 1075, 1084 (2d Cir. 1995)(emphasis added).

[3] The Defendants' adverse action caused Plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity.   Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation. See Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000); Thaddeus-X, 175 F.3d at 398; Crawford-El v. Britton, 93 F.3d 813, 826 (D.C. Cir. 1996) (en banc), rev'd on other grounds, 523 U.S. 574, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); Bart, 677 F.2d at 625.

[4] Defendants' actions effectively chilled the exercise of Plaintiff's First Amendment right.

Regardless of which standard this Court adopts, Time's UP has alleged both an actual chill See Complaint at paragraphs 255-257 ("*Complaint@_*") as well as facts that would effectively chill a reasonable person *(Complaint@passim[5])*.

Time's UP has alleged[6] that the NYPD's conduct on October 29, 2004 was in retaliation for Time's UP Constitutionally protected activity. (*Complaint@passim, 212, 213, 215, 216, 219, 227, 255)*   As set out in the Complaint, Time's UP engages in educational events and expressive activities for the purpose of promoting environmental awareness, including bicycling as a clean transportation alternative, and in support of the rights of citizens to enjoy, use, and benefit from clean transportation alternatives. (*Complaint@12-13)*

One of the expressive activities in which Time's Up and its members participate is a monthly bicycle ride through New York City called Critical Mass.   For several years, the NYPD did not interfere with – and, indeed, assisted in facilitating the safe operation of – the Critical Mass monthly bicycle ride. (*Complaint@30, 31)*   However, in August 2004, the NYPD reversed this policy.  As has been widely reported in various litigations set forth in the complaint (*Complaint@33-45)* Defendant engaged in a massive city-wide spying operation gathering intelligence on any groups it deemed to be potential protesters at the pending Republican National Convention ("RNC"), held in New York City From August 30, 2004 to September 2, 2004.  Documents that have since been made public, and reported in the *NY Times*, have identified Time's UP as a group spied on by the NYPD.

---

[5] Taken as a whole, the complaint alleges that much of the complained about conduct was the result of the NYPD focusing on Time's UP and other groups associated with protesting the RNC and supporting Critical Mass Bicycle Rides.
[6] As the Court is aware, and as Defendant states in its Motion to Dismiss, all of Plaintiff's allegations are to be taken as true for purposes of the instant motion.

Defendant's politically motivated hostility towards Time's UP expressive activity was evinced in its sudden change of policy towards the Critical Mass bicycle rides. (*Complaint@40*)   After arresting over 200 bicycle riders participating in the August 2004 Critical Mass bicycle ride (*Complaint@42*)  and unlawfully seizing bicycles in the September 2004 Critical Mass bicycle ride (*Complaint@71, 72*) and facing legal challenges in Court, <u>Bray v. City of New York</u>, (*Complaint@73-76*) the defendant continued to retaliate against those participating in expressive activity, including Time's UP. Defendant's animosity towards Times Up was on further display in an op-ed piece in *The Daily News*, in which Commission Raymond Kelley charged that the Critical Mass bicycle rides had been taken over by what he deemed as "extremists." (*Complaint@77, 78*)  Although he did not name Time's UP specifically, it is believed, and alleged, that the covert intelligence reports had identified Time's UP as the organizer and/or sponsor of the monthly Critical  Mass bicycle rides as well as other protests at the RNC. (*Complaint@179, 180*)   Based upon this misunderstanding of Time's UP position within the Critical Mass bicycle rides, it is obvious that Commissioner Kelly was referring, at least in part, to Time's UP as the purported "extremist" group. (*Complaint@79*)

On October 29, 2004, the defendants sought to force the participants in Critical Mass bicycle ride to utilize an NYPD pre-authorized route. At the location of the start of the ride, two main groups were passing out flyers. (*Complaint@86*)  NYPD Officers were passing out a flyer with its designated pre-authorized route for the bicycle ride. (*Complaint@85*)   Members, friends and volunteers of the Plaintiff were passing out flyers promoting its Halloween (After) Party to start when the bicycle ride finished.  The party location identified on these flyers was the Time's UP headquarters, 49 E. Houston Street. (*Complaint@87*)  About twenty minutes after the ride began on the designated police route, the ride left the designated route and the Police responded.  Approximately

thirty arrests of bicycle riders were made that evening. (***Complaint@48***)  The conduct complained of in the subject complaint occurred thereafter at, about and in front of, the Time's UP headquarters. (***Complaint@94-178***)

Plaintiff Time's UP alleges that the Defendant's overreaching, wrongful and unlawful conduct on the night of October 29, 2004 was in retaliation for Time's UP's continued support for its protected expressive activity including, but not limited to the August, September and October 2004 Critical Mass bicycle rides. (***Complaint@211-213***) Most certainly, any person of "ordinary firmness" present at the Time's Up fundraiser party could most easily find themselves chilled or deterred from participating in any other Critical Mass bicycle ride, or involving themselves in any other Constitutionally protected activity supported by Time's UP.  Within the complaint Time's UP alleged that this conduct actually caused a chill to its First Amendment expressive rights. (***Complaint@255-257***)

Therefore, these allegations, if taken as true, clearly state a claim upon which relief can be granted.  Fed. R. Civ. P 12(b)(6).  Accordingly, Defendant's Motion to Dismiss should be denied.

### III.    First Amendment: Defendant Violated Time's UP Right of Association

The First Amendment "protects the right to associate for purposes of engaging in expressive activities." Freeman v. City of Santa Ana, 68 F.3d 1180, 1189 (9th Cir. 1995). The Supreme Court has "recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment - speech,  assembly, petition for the redress of grievances, and  the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties." Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18, 104 S.Ct. 3244, 82 L.Ed.2d 462

(1984). Further, there is no dispute that organizations, such as Time's UP, has standing

to seek relief for the deprivation of such a right because "organizations have … standing

where the associational rights of their members are infringed and where the activities of

the organizations are restricted or injured by unconstitutional conduct." <u>Smith v. Meese</u>,

821 F.2d 1484, 1493, fn 7 (11th Cir. 1987), *citing* <u>Hunt v. Washington State Apple</u>

<u>Advertising Commission</u>, 432 U.S. 333, 343, 97 S.Ct. 2434, 53L.Ed.2d 383 (1977).

As set out in the Complaint, Defendant's actions on October 29, 2004 were

overwhelming and egregious (***Complaint@96, 103-107***) – certainly sufficient to chill (at

the very least) Time's UP associational rights as protected by the First Amendment. As

noted in the Complaint, officers of the NYPD attempted to enter the Halloween Party

fundraiser. They were unwilling to pay an entrance fee, had no warrant, and did not even

identify themselves as Police Officers. (***Complaint@95***) They were therefore declined

permission to enter. And yet, notwithstanding the refusal by Time's UP to permit their

entry, at least one officer in plain clothes forced his way into the space, and began hitting,

pushing, and striking those inside. (***Complaint@96***) The NYPD then made a gratuitous

display of force by closing down Houston street, flooding the street with somewhere

between thirty-five and sixty officers and ten or more official vehicles. (***Complaint@96,***

***103-107***) Traffic was closed on Houston Street (the main crosstown thoroughfare in the

City of New York for traffic between Fourteenth Street and Delancey Street) in all of the

East bound lanes from Lafayette to Mott Street and at least one of the West bound lanes.

(***Complaint@96, 105-106***) There was one officer seen walking around holding a sniper

rifle.

The NYPD intimidated Time's UP and its members further still by forming a wall

of officers in front of the entrance to the building, and by blocking those inside from

leaving. (***Complaint@116***) The individuals inside – all of who were either members or

guests of Time's UP -- were therefore trapped inside by the police. (***Complaint@199-200***)  The actions of the police that evening so frightened the Time's UP members, putting them in fear of arrest, that many fled through a window and escaped through a cemetery located at St. Patrick's Old Cathedral. The police continued to keep the members, guests and friends trapped inside until at least 1:00 AM, when Civil Liberties Attorney Norman Siegel arrived, to negotiate their 'release.' (***Complaint@161-168***) Additionally, the NYPD deliberately attempted to cause the neighbors to hold Time's UP and its neighbors in a negative light, by conducting an administrative inspection of at least two commercial neighbors connecting the issuance of these violations with Time's UP activities that evening. (***Complaint@2, 19, 251-253, 266-268***)  In a clear showing of intimidation, in an attempt to chill Time's UP expressive conduct and its right to associate, the Officers forced the last members, guests and associates who were exiting the Time's UP headquarters with Counselor Siegel, to walk West on Houston Street towards Mulberry Street. (***Complaint@169***)  And even though the officers had been on the scene for more than two hours at that time, it was only at this precise moment that they retrieved a circular saw from the trunk of one of the official vehicles and began cutting down bicycles locked to a fence on the corner of Houston Street and Mulberry Street (the same corner which the NYPD was dictating that each person walk by at that same moment). (***Complaint@170***)  The Officers clearly were attempting to intimidate these individuals, and the Plaintiff alleges this was done with the intent of chilling the expressive speech and associational rights of Time's UP. ((***Complaint@passim***) Admittedly, Time's UP cannot seek monetary redress on behalf of the individual's whose bicycles were cut down at that moment (or those who were forced to flee through a window, or those who were held against their will in the Time's UP space), nonetheless this 1983 complaint is properly pled for Time's UP to seek redress for its personal

damage, separate and distinct from those suffered by individuals, that evening at the hands of the NYPD. See Smith v. Meese, 821 F.2d 1484, 1493 (11th Cir. 1987) (the injury alleged here – the chilling of plaintiffs' associational and political rights … can be real and immediate.).

### IV.    Defendant's Wrongful Conduct Deprived Time's Up of its Constitutionally Protected Property Interests Pursuant to the Due Process Clause of the Fourteenth Amendment

As set out above, Defendants displayed an overwhelming and unwarranted show of force on the evening of Halloween Party and Fundraiser.   This show of force, and outright intimidation, in addition to depriving Time's UP of its protected interests under the First Amendment, also deprived it of its liberty and property interests as guaranteed by the Due Process Clause of Fourteenth Amendment of the Constitution. Specifically, Time's Up was deprived of  (a) its liberty interest in engaging in the occupation of its choosing, and (b) its property interest of its business goodwill and reputation.

Courts have routinely recognized a constitutionally recognized right to pursue one's occupation. See e.g., Wedges/Ledges, Calif. v. City of Phoenix, Ariz., 24 F.3d 56 (9th Cir. 1994) (recognizing the right to pursue one's occupation as protected by the Due Process Clause of the Fourteenth Amendment).   Therefore, "…a Fourteenth Amendment claim for deprivation of a liberty interest without due process will lie where the plaintiff alleges that municipal actors, acting under color of state law, intentionally harassed and arbitrarily interfered with his right to conduct his chosen operation within the parameters of the law." R.S.S.W., Inc. v. City of Keego Harbor, 18 F. Supp.2d 738, 746 (E.D.Mich. 1998); See also Benigni v. City of Hemet, 879 F.2d 473 (9th Cir. 1988) (holding that the plaintiff, owner of a restaurant/bar, stated a cause of action for deprivation of a liberty interest by alleging that the defendant City engaged in a campaign of harassment that

infringed on the plaintiff's constitutional right to pursue an occupation); <u>Sanderson v. Village of Greenhills</u>, 726 F.2d 284, 286-87 (6th Cir. 1984) (holding that the plaintiff owner of a billiards parlor had stated a claim for deprivation of his liberty interest to engage in "whatever legal business he elects to pursue" and holding that the defendant City's interference with the plaintiff's business was arbitrary and thus unconstitutional); <u>Wilkerson v. Johnson</u>, 699 F.2d 325 (6th Cir. 1983) (holding that harassment and delay in plaintiffs' attempt to obtain a barber's license constitutes a due process violation of the plaintiffs' liberty interest in the pursuit of that occupation).  Further still, corporations hold the right to pursue an occupation no less than individuals do.  <u>See</u> <u>Wedges/Ledges, Calif.</u> 24 F.3d at  65  ("Moreover, corporations, as legal persons, also can assert a right to pursue an occupation") *citing*  <u>Physicians' Serv. Med. Group v. San Bernardino County</u>, 825 F.2d 1404, 1407 (9th Cir. 1987) ("A corporation … is a `person' possessing Fourteenth Amendment due process rights.").

Here, Defendant's actions on October 29 were, as alleged, intended to deter, or altogether stop, Time's UP from pursuing its occupation – to wit, that of supporting expressive actions in connection with alternate forms of transportation. (***Complaint@passim, 212, 213, 215, 216, 219, 227, 255)*** The harassment, as set out above and in the Complaint, was extensive, ongoing, and massive. It included the repeated arrests of participants in the Critical Mass bicycle rides, (***Complaint@47-70)*** as well as the unwarranted force imposed upon Time's UP, and its surrounding business community, on the night of the fundraiser. (***Complaint@96, 103-107***) Thus, as in <u>Benigni</u> and <u>Wilkerson</u>, the City's harassment of Time's UP amounted to a deprivation of its Fourteenth Amendment liberty interest.

Time's Up was additionally deprived of its property interests insofar as the harassment by Defendant was designed to tarnish its goodwill. (***Complaint@96, 259,***

*261*)  The Supreme Court has recognized that a company has a property interest in its goodwill and that a deprivation of such a right gives rise to a Constitutional claim.  While denying that false advertising by a third party impacted a business property right, the Court stated in dicta, "[t]he assets of a business (including its good will) unquestionably are property, and any state taking of those assets is unquestionably a "deprivation" under the Fourteenth Amendment."  College Savings Bank v. Florida P.P.E.E.B., 527 U.S. 666, 675, 119 S. Ct. 2219, 2225, 144 L. Ed. 2d 605,616 (1999).

New York courts have recognized that business goodwill is a legitimate property interest. See e.g., Garber Bros., Inc. v. Evlek, 122 F.Supp.2d 375, 380 (E.D.N.Y. 2000). (recognizing business goodwill as a legitimate property interest); Ecolab, Inc.,  v. K. P. Laundry Machinery, Inc., 656 F. Supp. 894, 899 (S.D.N.Y. 1987) (same); In re Norman Schultz, 250 B.R. 22 (E.D.NY. 2000) (same). Where, as here, a state recognizes business goodwill as property, goodwill accordingly enjoys the Due Process protections of the Fourteenth Amendment.  See Wedges,  24 F.3d at 65 ('where state law treats goodwill as property, "[business goodwill] is a property interest entitled to protection; the owner cannot be deprived of it without due process"') *quoting* Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1316 (9th Cir. 1989). Further, given that, as set out above, expressive activities fall within the ambit of First Amendment protection, an organization's goodwill – that facilitates and enables its lawful promotion, participation and advocacy in such expressive activities - enjoys Constitutional protection.

Here, Defendant's provocative actions on the evening of October 29 diminished Time's UP's goodwill as an organization thereby harming its ability to lawfully engage in expressive activities.  Thus was the injury to Time's UP's goodwill twice-over: once as a deprivation of its property interest, and again, as a deprivation of its freedom of expression.  Indeed, Time's UP's claim for redress for injury to its goodwill enjoys all the

more import insofar as its goodwill was that of an organization designed to engage in First Amendment-protected activity. Accordingly, Time's UP is legally entitled to be compensated for the loss of its goodwill.

### V.    Times UP Properly Pled Allegations Supporting a Violation of Its Fourth Amendment Right Against Unlawful Search and Seizure

It is well-settled that an individual has a Constitutionally protected right against search and seizure in its home or place of business. Freeman v. City of Santa Ana, 68 F.3d 1180 (9th Cir. 1995) (the Fourth Amendment protects the owner of a bar from unreasonable searches and seizures of her establishment.) See Soldal v. Cook County, 506 U.S. 56, 113 S.Ct. 538, 544, 121 L.Ed.2d 450 (1992) (holding that the Fourth Amendment protects property); Benigni v. City of Hemet, 879 F.2d 473, 477 (9th Cir. 1988)(upholding jury determination that frequent bar checks were unreasonable under the Fourth Amendment); Blackie's House of Beef, Inc. v. Castillo, 659 F.2d 1211, 1216 n. 5 (D.C. Cir. 1981), *cert. denied*, 455 U.S. 940 (1992) (holding that restaurant owner had standing to challenge entry and search of its premises).

Defendant argues that Time's UP's claims are futile because the police could have entered the space without a warrant by virtue of their powers to conduct administrative searches (a search conducted pursuant to express statutory authorization). This argument fails on many levels. First, "defendant's ability to justify the purported adverse action on non-retaliatory grounds is irrelevant because `[a]n act in retaliation for the exercise of a constitutional right is actionable under section 1983 even if the act, when taken for different reasons, would have been proper.'" Saleh v. City of New York (06 Civ. 1007 (SHS))( S.D.N.Y. 12-17-2007), *citing* Franco v. Kelly, 854 F.2d 584, 590 (2d Cir. 1988) (*quoting* Howland v. Kilquist, 833 F.2d 639, 644 (7th Cir. 1987). Secondly, this argument would render meaningless the right to be free from warrantless physical entries into the

home, which the Supreme Court has recognized to be "the chief evil against which the wording of the Fourth Amendment is directed." <u>Payton v. New York</u>, 445 U.S. 573, 585-86, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (*quoting* <u>United States v. United States Dist. Court</u>, 407 U.S. 297, 313,92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). Plaintiff intends to show at trial that none of the *creative lawyer rationale* set out by the Defendants for the police actions that night were the *actual* reasons. The *actual* reason -- which is a question of fact, to be determined at trial -- was the NYPD's animosity towards Time's Up Constitutionally protected expressive activity. Thus, *even if* Defendants reliance on (a) ABC 106, et seq. (b) Cabaret Code; and/or (c) Building Code, had merit, such reliance would be *irrelevant*, given the Constitutionally impermissible reason for reliance on those statutes. However, as shown below, even taken on their own terms, Defendants arguments with respect to such statutes are specious. The plain language of the relevant statutory provisions do not support its position.

While it is true that some inspections of "closely regulated" businesses, such as businesses in the alcoholic beverages industry, may be performed without a warrant (See <u>N.Y. v. Burger</u>, 482 U.S. 691, 700, 702, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987)), such warrantless searches are permissible only under very limited circumstances (none of which are met here). First, the enabling statute must expressly authorize warrantless searches. If the statutory authorization for the search is silent on the matter, then a warrant must be obtained. <u>See</u> <u>Colonnade Catering v. U. S.</u>, 397 U.S. 72, 77, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970). Second, "the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant." <u>Burger</u>, 482 U.S at 703. Finally, where the search is conducted "for contraband or evidence of crime," the exception permitting warrantless inspections is inapplicable. <u>Donovan v. Dewey</u>, 452 U.S. 594, 599, 101 S.Ct. 2534, 69 L.Ed.2d 262

14

(1981) (citing GM Leasing v. United States, 429 U.S. 338, 352-359, 97 S.Ct . 619, 50 L.Ed.2d 530 (1977)).

Furthermore, Force may not be used to conduct an administrative search without a warrant. See Colonnade, 397 U.S. at 77 (applied to administrative search of a nightclub); Sepulveda v. Matos, 306 F.Supp.2d 100, 104 (D.P.R 2004) (same, applying 'no use of force' std.").

Even if the Defendant read the statutory schemes correctly (which as demonstrated herein, they did not), it would be irrelevant. The relevant question in Fourth Amendment analysis is what the officer could reasonably have known at the time. Given the facts as alleged, the officers simply could not have known any of the facts upon which Defendants rely (e.g. purported "selling" of alcohol, purported violation of cabaret laws, etc.) This makes even all the more transparent Defendants attempt to hide a manifest Fourth Amendment violation behind contrived veil of statutory provisions. Again, as set out at the outset, these statutory provisions, Plaintiff alleges were not -- and *could not have been* -- the actual reason for the actions that night (given what an officer could "reasonably believe" at the time.) Plaintiff respectfully suggests that this Court should not countenance Defendant's attempt to denigrate the Fourth Amendment and countenance warrantless entries, which, as the Supreme Court has acknowledge, is "the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585-86, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (*quoting* United States v. United States Dist. Court, 407 U.S. 297, 313,92 S.Ct. 2125, 32 L.Ed.2d 752 (1972)). "

### A. *Time's UP Not Subject to Administrative Search as Licensed Premise*

Defendants argue that Time's UP "sold" alcoholic beverages, and therefore was subject to the administrative search provisions of the New York State Alcoholic Beverage

15

Control Law § 106(15). As an initial matter, Defendants improperly base their arguments upon evidence outside the pleadings. Whether or not such evidence would establish that Time's UP sold alcohol, the Court's analysis of Defendants' allegations of futility must be based on the pleadings alone. Even *assuming arguendo*, that Time's UP was engaged in the sale of alcohol, Defendants' argument is unavailing as the cited case law is inapplicable involving a social club which regularly sold alcohol, while Time's UP is an advocacy organization whose regular programs involve community bicycle rides and workshops, not selling alcohol (http://times-up.org/calendar/calendar.php).

Even with the evidence presented, Defendants have not established that, as a matter of law, Time's UP sold alcohol. To begin with, they have not alleged that Time's UP distributed alcohol: only that it was consumed. Furthermore, the authority on which the City relies demonstrates that if Time's UP did distribute alcohol, whether that constituted a sale 1) would depend on other evidence Defendants have failed to provide, and 2) would be a question of fact for the jury. Defendants rely on NYSLA v. Sutton Social Club, 93 Misc.2d 1024 (Sup. Ct. N.Y.Co. 1978), arguing that Sutton equates the distribution of alcohol at an event at which an entry fee is charged to the sale of alcohol as a matter of law. However, the ruling of the court in Sutton was a factual determination made at the conclusion of a nonjury trial by the judge acting as fact finder. The judge made the factual determination that the social club made "nightly expenditures and expenses which . . . primarily include the cost of liquor and other alcoholic beverages." Sutton, 93 Misc.2d at 1027. Sutton establishes that a finding of sale is a factual determination that requires, at least, some evidence of nexus between the entry fee and the purchase of alcohol,. Indeed, the court in Sutton sets forth the very exception that fits Time's UP: "Nor can respondent's weekend activities be equated to the occasional dinner- dance given by a legitimate political, religious, fraternal or charitable club." Id.

Time's UP as the pleadings show, is a registered 501(c)(3) corporation, which had a single fundraising event on Oct. 29-30, 2004. Thus, even considering the evidence presented by the Defendants, it cannot be said that as a matter of law, Time's UP violated the N.Y. Alcoholic Beverage Control Law. As a consequence, Defendants' conclusion that a police search would be justified by this "violation" is unsupported.

Furthermore, even if Time's UP "sold" alcohol, Time's UP was not subject to administrative search pursuant to the Alcoholic Beverage Control Law. The plain language of the inspection provision in ABC§106(15) limits its application to <u>licensed</u> premises. ABC§§ 123 & 130, which contain explicit provisions for unlicensed premises, amply demonstrate that when the legislature wished a provision to apply to unlicensed premises, it said so. The state's lawful responses to Time's UP's purported violation would be limited to either 1) seeking an injunction against Time's UP pursuant to ABC§123, or 2) seeking to fine Time's UP pursuant to ABC§130. Once again, Defendants rely on <u>Sutton</u>, but the court in <u>Sutton</u> did not rule that the social club was subject to any of the other provisions of the ABC Law, like ABC§106(15)). It did not rule that the club was part of the liquor industry, or was subject to administrative search. It simply applied ABC§123 to an unlicensed premises.

Defendants argue that <u>Burger</u> "implicitly" supports the notion that ABC§106(15) applies to unlicensed premises despite the fact that the provision's plain language states otherwise. However, the statute authorizing the search in <u>Burger</u> applied to "[e]very person required to be registered pursuant to this section." That is, the statute's plain language applied to anyone, registered or not, so long as they <u>should</u> have been registered. The language of ABC§106(15))is dissimilar: it expressly applies only to licensed premises. Defendants' argument that a warrantless search was "implicitly" authorized is meritless. <u>See</u> <u>Colonnade</u>, 397 U.S. at 77.

Even if ABC§106(15))were deemed applicable to Time's UP, the defendants

exceeded the authority granted by the statute.  Only where such an inspection statute

explicitly authorizes the use of force to conduct the warrantless search, may the police

use forcible entry to conduct the search.  See Colonnade, 397 U.S. at 77, Sepulveda, 306

F.Supp.2d at 104. ABC§106(15) does not authorize the use of force.  Here, the police

attempted to force their way into the premises, hitting and pushing the people inside.  The

police blockade of the Time's UP premises, and the force used against Time's UP

members, are also far outside the provisions of ABC§106(15)).  Furthermore, the initial

illegal entry by the NYPD were by undercover officers who did not identify themselves

as police, and did not inform anyone that their purpose was to inspect the premises

pursuant to ABC§106(15).  The Eleventh Circuit has held that such a response is

inconsistent with authorities' claim that they were conducting an administrative search.

Swint v. Wadley, Alabama, 51 F.3d 988, 998-999 (11th Cir. 1995) (considering the

"massive show of force and excessive intrusion witnessed in the December 1990 and

March 1991 raids" on a nightclub, "[n]o reasonable officer in the defendants' position

could have believed that these were lawful, warrantless administrative searches.").

### B.    *Warrantless Search of Time's UP Pursuant to*
### *ABC§ 106(15) Is Not Constitutional*

*Assuming arguendo* that the language of ABC§106(15) applies to unlicensed

premises including Time's UP, it is unconstitutional as so applied.  Burger relates the

constitutional requirements of a statutory program of warrantless administrative searches

within a highly regulated industry.  Among these requirements: [T]he statute's inspection

program, in terms of the certainty and regularity of its application, must provide a

constitutionally adequate substitute for a warrant...  the statute must be 'sufficiently

comprehensive and defined that the owner of commercial property cannot help but be

aware that his property will be subject to periodic inspections undertaken for specific purposes." Burger, 482 U.S. at 703. A search under ABC§106(15) is constitutional, as applied here, only if Time's UP could "not help but be aware" that its property would be subject to inspection. Defendants suggest that where ABC§106(15) states that it applies to "retail licensed premises" it really means "retail licensed and unlicensed premises." Even if this was the Legislature's intent, the chosen language fails to put unlicensed entities on notice that the inspection provision nevertheless applies to them.

### C.    Time's UP Was Not Subject to A Search for Purported Violations of the Cabaret Law

Likewise, Defendants' arguments concerning the Cabaret Law are unfounded. N.Y. Admin. Code § 20–362 specifically exempts "Premises owned, occupied and used exclusively by a religious, charitable, eleemosynary or educational corporation or institution." Time's UP is a tax-exempt educational corporation, falling within the charitable exception. And, like the ABC Law, the regulation promulgated by the Department of Consumer affairs pertaining to inspection of licensed cabarets does not authorize the use of force to conduct an inspection.

Furthermore, Defendants improperly base their contention that the Cabaret Law was violated on portions of the CCRB report, which are not part of the pleadings. Defendants have selected a handful of pages from the CCRB report, which contains approximately 600 pages, and have annexed these pages as factual exhibits to their opposition papers. The exhibits cited are summaries of testimony at the CCRB hearings by Amy and Laura Starecheski, and Mandy Hu. Defendants state: "all three plaintiffs acknowledged there was music and dancing inside Time's UP on the night of October 29-30, 2004." In fact, only one (the summary of Laura Starecheski's testimony) actually contains a statement that there was music and dancing, not all three. The evidence presented does not support

their contentions.  A cabaret license is required only for <u>live</u> musical performances.  See

N.Y. Admin. Code. § 20–359.  The summary of Laura Starecheski's testimony does not

indicate whether the music she referred to was live or recorded.  The reference simply to

"music" does not establish that there was a Cabaret Law violation.  To the extent that

Laura's statement about dancing is significant, its significance cannot be appreciated

without taking into consideration other evidence that Defendants have not provided, such

as when during the evening the dancing occurred and whether the police knew of it.  The

Defendants have reached beyond the pleadings only to present this Court with muddled,

inaccurate, and irrelevant facts.

### D.    *Time's UP! Was Not Subject to A Search for <u>Purported Violations of the Building Code</u>*

Defendants also claim that the police had authority to enter the building to enforce

building codes.  This argument has no basis in the pleadings, and is unfounded as a

matter of law.  Defendants cite a New York City Building Code provision, which they

allege, applied to Time's UP, and which requires a particular permit for occupancy by

more than 75 persons.  Then, Defendants state: "The Proposed Amended Complaint

alleges facts suggesting that at least seventy-five people were present in Time's UP on

the night of Oct 29-30, 2004."  Finally, Defendants "submit that the use of public spaces

is 'closely regulated' in much the same way that the sale of liquor is closely regulated,

and therefore the officers' entry into the premises without a warrant was consistent with

the Fourth Amendment."

As the Defendants' language shows, they have no idea how many people were in

Time's UP on the night in question: the Plaintiffs' use of the adjective "many" *suggests*

to Defendants that more than seventy-five people were present.  Defendants' assertion

that the pleadings demonstrate that Time's UP violated building codes is unsupported.[7]

Furthermore, a code violation would not justify a warrantless entry into Time's UP. Defendants cite Burger to support their submission that "public spaces" are a closely regulated industry. There is nothing in Burger that says this, or anything like this. Indeed, it is an astonishing proposition. It would mean that any public space could be subject to search without a warrant. As Defendants well know, the law is otherwise. The doctrine of Burger applies to closely regulated industries, and "public spaces" is not an industry. Burger notes the narrowness of the closely-regulated industry exception. Burger, 482 U.S. at 711. Indeed, the Burger Court approved its own earlier dismissal, in Marshall v. Barlow's, Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), of an argument much like that of the Defendants, asserting that the exception could apply to "all businesses engaged in interstate commerce." Burger, 482 U.S. at 701.

Finally, Defendants' rely on administrative regulations purportedly authorizing the warrantless searches to enforce the Building Code. Defendants' state that the City Charter provision which states that "it shall be [the] duty" of the police "to enforce and prevent the violation of all laws and ordinances in effect in the city," grants the police power to conduct this enforcement without a warrant. ***If this were true, then the police would never need a warrant for any search.*** However, the provision is clearly a general statement of purpose, and nothing more. But there is no enabling statute authorizing warrantless searches in Building Code enforcement, which, as discussed earlier, is a constitutional requirement for warrantless administrative searches to be valid.

### E. Police Were Not Acting as Administrative Inspectors

---

[7]   Indeed, two of the statements, which Defendants rely on to support, their argument that Time's UP violated the Cabaret Law, contradict their inference that the space was overcrowded. The summary of Amy Starecheski's testimony states: "At the peak of the party 40-50 people were on the ground floor. (Larkin Dec. Ex. A)  The summary of Laura Starecheski's testimony contains the statement: "The party was not crowded" (Larkin Dec. Ex. B)  Mandy Hu's testimony is summarized as saying that the crowd in the space had "thinned out" at the time the police arrived.  (Larkin Dec. Ex. C)

Where a search is conducted to search "for contraband or evidence of crime," the exception permitting warrantless inspections is inapplicable.  Donovan, 452 U.S. at 599 (citing GM Leasing, 429 U.S. at 352-359).  Plaintiffs allege facts sufficient to show that the police were engaged in an unconstitutional exercise of their powers to enforce the criminal law, and were not acting merely to enforce administrative codes on the night in question.  It is impossible to rule as a matter of law that any police power to conduct administrative searches renders the Plaintiffs' Amended Complaint futile.

**F.  Any Search or Seizure Must be Tailored to Facts Known by Officers Present**

Although the City seems satisfied with attempting to overcome the Fourth Amendment protections with hindsight and Monday Morning lawyering, this is not constitutionally permissible. "For Fourth Amendment purposes, the reasonableness of an officer's belief must be assessed in light of the particular circumstances confronting the officer at the time." Kerman v. City of New York, 261 F.3d 229 (2nd Cir. 2001), *citing* Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); See also Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (holding that when analyzing the reasonableness of a search or seizure, "it is imperative that the facts be judged against an objective standard").  The appropriate query is whether in the City of New York, it was objectively reasonable for Lt. Fanale to make a level 1 mobilization in response to a Halloween party being hosted by a non-profit, expressive advocacy organization that resulted in the closure of a major crosstown thoroughfare and subsequently arrest individuals from this party for 'blocking the sidewalk." Was it reasonable for officers to force their way into the headquarters of Time's UP?  Was it objectively reasonable for Police Officers to form a wall of blue in front of the entrance to the Times UP premise detaining members inside the premises, arresting individuals who exited the premise and for all intent and purposes, detaining the individual known as

Time's UP against its will in its own home.  See Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319,  75 L.Ed.2d 229 (1983) ("The scope of the detention must be narrowly tailored to its underlying justification.") It is well-established that "[w]arrantless searches inside a home are presumptively unreasonable." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998) (citing Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Admittedly, if exigent circumstances exist, a warrantless entry into one's home may be justified. Hurlman v. Rice, 927 F.2d 74, 79 (2nd Cir. 1991). Nonetheless, there is no evidence (nor allegations present on the scene) of any exigent circumstance.  Reid v. Georgia, 448 U.S. 438, 440 (1980) ("[A]ny curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity."); Terry, 392 U.S. at 19 ("The scope of the search must be strictly tied to and justified by the circumstances which rendered its initiation permissible.") (internal quotations omitted).  Time's UP has alleged that it was held against its will in its home and had its liberty curtailed by conduct of the NYPD.

## VI.    The Plaintiffs Have Given Sufficient and Fair Notice To the Defendants of Various Constitutional Violations For Which It Seeks Recompense

Plaintiff has properly plead various facts and allegations, which if proven, establish liability against the defendant for multiple violations of its Constitutional rights including First Amendment violations of retaliation for expressive activity and interference with rights of expressive message association; Fourth Amendment violations related to the illegal search and seizure of Time's UP and Fourteenth Amendment

violations of attempting to deprive the Plaintiff of a property right to pursue an occupation (expressive advocacy) without good cause or due process of law.[8]

To the extent an argument is raised in reply that these causes of actions were not specified in the complaint, it is well settled that '[t]he classic verbal formula is that a complaint need only be sufficiently detailed to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" EEOC v. Concentra, 496 F.3d 773, 779-780 (7th Cir. 2007) (*quoting* Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). *See also,* Friedlander v. Cimino, 520 F.2d 318 (2nd Cir. 1975) (While clarity and precision are desirable in any pleading, the F.R.C.P. require little more than an indication of the type of litigation that is involved. A generalized summary of the claims and defenses, sufficient to afford fair notice to the parties is enough) (internal citations omitted). "It is clearly the intent of the liberal notice pleading system to ensure that claims are determined on their merits rather than through missteps in pleading." EEOC v. Concentra, 496 F.3d at 780, *quoting* 2 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 8.04 (3d ed.2006). *Accord* Walker v. Benjamin, 293 F.3d 1030, 1039 (7th Cir.2002) ("Instead of lavishing attention on the complaint until the plaintiff gets it just right, a district court should keep the case moving." *quoting,* Bennett v. Schmidt, 153 F.3d 516, 518 (7th Cir.1998)); see also Dioguardi v. Durning, 139 F.2d 774, 775 (2d Cir.1944) (describing attempts to force all facts into the complaint

<hr>

[8] Defendant's moving papers failed to counter each cause of action set forth in Plaintiff's complaint. Specifically, the moving papers do not mention the fourth Cause of Action, Failure to Intervene. It is well-settled in this jurisdiction "if a police officer does not personally use excessive force, but witnesses the use of excessive force by other officers, that witnessing officer may be liable for failing to intercede to prevent the constitutional violations of other officers where the officer had reason to know such force was being used and had a realistic opportunity to intercede." Davis v. City of New York, (JFB) (E.D.N.Y. 2-15-2007), *citing* Provost v. City of Newburgh, 262 F.3d 146, 168 (2d Cir. 2001) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.") (citation and internal quotations omitted); Curley v. Vill. of Suffern, 268 F.3d 65, 72 (2d Cir. 2001) ("Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be."); accord O'Neill v. Krzeminski, 839 F.2d 9, 11-12 (2d Cir. 1988).

24

as "judicial haste which in the long run makes waste"); <u>Hou v. NYCDEP</u>, (S.D.N.Y. 2001) 98 Civ. 1518 (LBS) (HBP)(There can be no serious dispute that the Federal Rules of Civil Procedure abandoned the rigid rules of pleading that existed 70 years ago. The drafters of the Federal Rules of Civil Procedure even went so far as to refrain from using the expression "cause of action" in order to underscore the intended departure from arcane pleading rules.).

**Conclusion**

For the reasons set forth herein, the Plaintiff respectfully requests that this Court rule in its favor and find that the complaint properly alleges facts that satisfy all pleading and standing requirements.  The complaint sets forth allegations that the conduct that occurred on October 29, 2004 was authorized and ordered by the top levels of the NYPD; that this conduct actually harmed Time's UP by depriving it of certain Constitutional rights and that this lawsuit is brought to compensate Time's UP for this harm.


Dated:       January 28, 2008
             New York, New York

                                    _____
                                    Wylie M. Stecklow, Esq. (WS 6012)
                                    WylieLAW
                                    Attorney for Plaintiffs
                                    10 Spring – N Y C 10012
                                    (212) 566-8000


To: Michael A. Cardozo
Corporation Counsel of the
City of New York
Attorney for Defendants
100 Church Street, Room 3-216
New York, New York 10007
        Attn: Arthur Larkin, Esq.